852 F.Supp. 471 (1994)
UNITED STATES of America, Plaintiff,
v.
COMMONWEALTH OF VIRGINIA, et al., Defendants.
Civ. A. No. 90-0126-R.
United States District Court, W.D. Virginia, Roanoke Division.
April 29, 1994.
*472 Earl Montgomery Tucker, Robert P. Crouch, Jr., Richard A. Lloret, U.S. Atty's Office, Roanoke, VA, Nathaniel Douglas, John R. Moore, D. Judith Keith, Michael S. Maurer, Gary A. Haugen, Dana R. Carstarphen, U.S. Dept. of Justice Civ. Rights Div., Washington, DC, for U.S.
James A.L. Daniel, Daniel, Vaughan, Medley & Smitherman, P.C., Danville, VA, Joel I. Klein, Onek, Klein & Farr, Washington, DC, for Com. of Va.
Walter Alexander McFarlane, Com. of VA, Office of the Governor, Richmond, VA, James A. Dunbar, Venable, Baetjer & Howard, Baltimore, MD, for Lawrence Douglas Wilder.
J. William Boland, William G. Broaddus, Robert H. Patterson, Jr., McGuire, Woods, Battle & Boothe, Richmond, VA, for Virginia Military Institute, Board of Visitors of Virginia Military Institute.
J. William Boland, William G. Broaddus, McGuire, Woods, Battle & Boothe, Richmond, VA, William B. Poff, Woods, Rogers & Hazlegrove, P.L.C., Roanoke, VA, Robert H. Patterson, Jr., McGuire, Woods, Battle & Boothe, Richmond VA, for VMI Foundation, Inc., VMI Alumni Ass'n.
James S. Gilmore, III, Office of the Atty. Gen., William Henry Hurd, Richmond, VA, William Raymond Rakes, M. Chris Floyd, Gregory Joseph Haley, Gentry, Locke, Rakes & Moore, Roanoke, VA, for State Council of Higher Educ.
James S. Gilmore, III, Office of the Atty. Gen., William Henry Hurd, Richmond, VA, for George F. Allen.

MEMORANDUM OPINION[1]
KISER, Chief Judge.
This phase of this case ("Remedy") is on remand from the Fourth Circuit. Although the Fourth Circuit agreed that single-sex education was a legitimate pedagogical goal, it criticized the Commonwealth's avowed policy of supporting diversity in higher education through VMI in two respects: First, that there had been no authoritative articulation *473 that the Commonwealth sought to diversify its higher education system by offering single-sex education; and, second, that the program  as it now stands  is one-sided, i.e. that VMI offers a single-sex opportunity to young men while there is no comparable opportunity for young women. For these reasons, this case was remanded to this Court to permit the Commonwealth to "... formulate, adopt and implement a plan that conforms to the principles of equal protection...." United States v. Commonwealth of Virginia, 976 F.2d 890, 892 (4th Cir.1992) ("VMI").
There is substantial disagreement between the parties as to what is required by the remanding instructions of the Fourth Circuit and the Equal Protection Clause. It is the position of the United States that the mandate from the Fourth Circuit and the Equal Protection Clause require that if the Commonwealth opts to establish a separate program for young women, it must be in all respects equivalent to, i.e. a mirror image of, the VMI program.[2] The Commonwealth argues that the United States' position misconstrues both the meaning of the Fourth Circuit's mandate and the requirements of the Equal Protection Clause. The Commonwealth's position is that the mandate of the Fourth Circuit requires Virginia to provide a state-supported all-female college program that will attain an outcome for women that is comparable to that received by young men upon graduation from VMI. The Commonwealth argues that to attain the desired outcome for women, the Fourth Circuit's mandate does not require that an all-female program adopt the same or similar methodology as is used at VMI. The Commonwealth further argues that its view comports with the judicial gloss given, in this context, to the Equal Protection Clause  i.e. that the Commonwealth's system of higher education now satisfies intermediate scrutiny equal protection analysis applicable to sex-based discrimination.
If the United States' position is the correct one, then the Commonwealth's proposed Plan must fail because the Plan differs substantially from the VMI program. If the Commonwealth's position is the correct one, however, then an analysis of its proposed plan is necessary to determine whether it meets both the requirements of the Fourth Circuit's mandate and the requirements of the Equal Protection Clause. I am persuaded that the Commonwealth's position is the correct one and that its proposed plan meets the requirements of the Fourth Circuit's mandate and the requirements of the Equal Protection Clause. Here is why.

Procedural Background
At the outset of this phase of the litigation, this Court ruled that factual findings, which were made by this Court in the liability phase and approved by the Fourth Circuit, would not be open for reexamination. A full recitation of those facts is found in this Court's opinion at 766 F.Supp. 1407. A brief recitation of the operative findings made there will be sufficient for the present purposes.

District Court Opinion
After reviewing the legal principles that apply to intermediate scrutiny under the Equal Protection Clause, I reviewed the expert testimony pertaining to the benefits of a single-sex education and concluded that "viewed in the light of this very substantial authority favoring single-sex education, the VMI board's decision to maintain an all-male institution is fully justified even without taking into consideration the other unique features of VMI's method of teaching and training." *474 Id. at 1412. After making that finding, I then reviewed the effect that the admission of women to VMI would have on its program and concluded "the single-sex status would be lost and some aspects of the distinctive method would be altered if it were to admit women." Id. at 1413. Finally, I observed that there was an absence of a comparable opportunity for women, but concluded that this did not impair the legitimacy of the VMI program, and I did not seek to impose corrective action upon the Commonwealth because "the relief that the United States seeks in this suit is to require VMI to open its doors to women  not to force Virginia to establish an all-female, state-supported college." Id. at 1414.

Fourth Circuit Opinion
At the outset of its opinion, the Fourth Circuit stated,
[W]e accept the district court's factual determination that VMI's unique methodology justifies a single-sex policy and material aspects of its essentially holistic system would be substantially changed by coeducation. ... The Commonwealth of Virginia has not, however, advanced any state policy by which it can justify its determination, under an announced policy of diversity, to afford VMI's unique type of program to men and not to women.
p. 892.
The court stated that it was remanding the case "to the district court to require the Commonwealth of Virginia to formulate, adopt, and implement a plan that conforms to the principles of equal protection discussed herein." Id. at 892. The court then proceeded with its analysis. After reviewing this Court's finding with regard to the benefits of single-sex education in general  and VMI methodology in particular  and after reviewing the pertinent jurisprudence with regard to the proper application of equal protection under the intermediate scrutiny test, the court concluded, "In summary, the record supports the conclusion that single-sex education is pedagogically justifiable, and VMI's system, which the district court found to include a holistic formula of training, even more so." Id. at 898.
The appeals court proceeded to criticize the Commonwealth for failing to articulate, authoritatively and comprehensively, a policy with regard to single-sex education which would include both males and females. In summation, the Court stated:
We are thus left with three conclusions: (1) single-sex education, and VMI's program in particular, is justified by a legitimate and relevant institutional mission which favors neither sex; (2) the introduction of women at VMI will materially alter the very program in which women seek to partake; and (3) the Commonwealth of Virginia, despite its announced policy of diversity, has failed to articulate an important policy that substantially supports offering the unique benefits of a VMI-type of education to men and not to women.
Id. at 899.
Because of these deficiencies, the Fourth Circuit remanded the case to this Court to give the Commonwealth an opportunity to fashion a remedy that would address the constitutional violation identified by the Court. In so doing, the Court instructed:
[W]e do not mean to suggest the specific remedial course that the Commonwealth should or must follow hereafter. Rather, we remand the case to the district court to give the Commonwealth the responsibility to select a course it chooses, so long as the guarantees of the Fourteenth Amendment are satisfied. Consistent therewith, the Commonwealth might properly decide to admit women to VMI and to adjust the program to implement that choice, or it might establish parallel institutions or parallel programs, or it might abandon state support of VMI leaving VMI the option to pursue its own policies as a private institution. While it is not ours to determine, there might be other more creative options or combinations."
Id. at 900.

Interpreting the Fourth Circuit's Opinion
The overarching question in this phase of the litigation is: what does the Fourth Circuit's opinion require of a proposed plan in order to pass constitutional muster? As stated *475 above, the litigants disagree strongly on this issue. Both sides are able to support their arguments by fragmented readings of the Fourth Circuit's opinion. For example, the United States finds support in the statement "whether the unique benefit offered by VMI's type of education can be denied to women by the state under a policy of diversity...." VMI, 976 F.2d at 898. This statement would imply that a program for women must provide a VMI-type education. The United States urges that to comply with the instructions of the Fourth Circuit, the Commonwealth is required to produce a plan that will create a separate institution which closely resembles, if not clones, the physical plant, the curriculum, the methodology, the prestige, and many of the other attributes of VMI. In other words, the United States reads the Fourth Circuit opinion to require a "separate but equal" institution.[3]
The sophistry of the "separate but equal" concept was roundly rejected in Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950). Sweatt involved an equal protection challenge to the admissions policy at the University of Texas law school which categorically denied admission to blacks. Texas offered a newly established all-negro law school which it claimed remedied any constitutional violation which may have existed by virtue of UT's law school admissions policy. Although Sweatt was a racial discrimination case that applied strict scrutiny equal protection analysis, the rationale of the case applies to this case. The Sweatt Court, after reviewing the tangible qualities which made the University of Texas superior to the proposed new law school for negroes, stated:
What is more important, the University of Texas law school possesses to a far greater degree those qualities which are incapable of objective measurement but which make for greatness in a law school. Such qualities to name but a few, include reputation of the faculty, experience of the administration, position and influence of the alumni, standing in the community, traditions and prestige.
Id. at 634, 70 S.Ct. at 850.
Thus, if "separate but equal" is the standard by which the Commonwealth's plan must be measured, then it surely must fail because, as the United States pointed out time and time again during the trial, even if all else were equal between VMI and the Virginia Women's Institute for Leadership[4] ("VWIL"), the VWIL program cannot supply those intangible qualities of history, reputation, tradition, and prestige that VMI has amassed over the years. One must assume that the Fourth Circuit did not assign the Commonwealth an impossible task when it suggested that the Commonwealth was free to establish "parallel programs" or to devise "creative options or combinations" that would comply with the court's decision. It would be unrealistic to think that the Fourth Circuit was requiring an exercise in futility.
Moreover, the Fourth Circuit's opinion must be read in light of the portions of the district court findings, which the appeals court approved. The district court found VMI's male-only admission policy was justified without regard to VMI's unique methods of teaching and training. The Fourth Circuit's opinion approved specifically the district court findings in this respect when it stated, "the record supports the conclusion that single-sex education is pedagogically justifiable, and VMI's system, which the district court found to include a holistic formula of training, even more so." Id. at 898. Thus, both the district court and the appeals court held that the legal justification for VMI's all-male admission policy was contained in the benefits that flow from a single-sex education. The finding that VMI employed unique methods to teach young men was simply an added dimension to the already pedagogically justifiable policy.
The Fourth Circuit's subsequent decision in Faulkner v. Jones, 10 F.3d 226 (4th Cir. 1993), further bears out this interpretation of its mandate in this case. In amplifying its *476 decision in the VMI case, the Faulkner court stated,
We remanded the case to the district court with instructions to elicit a plan from the state complying with the Fourteenth Amendment. We allowed for the possibility that a plan could still permit VMI to remain a state-supported, single-sex institution, if that were the will of Virginia, so long as women were offered a parallel program. (citations omitted). The order in VMI did not, however, direct that any parallel program which the state might choose to provide be identical for both men and women.
* * * * * *
[A]ny analysis of [a parallel program] in response to a justified purpose must take into account the nature of the difference on which the separation is based, the relevant benefits to the needs of each gender, the demand (both in terms of quality and quantity), and any other relevant factor. In the end, distinctions in any separate facilities provided for males and females may be based on real differences between the sexes, both in quality and quantity, so long as the distinctions are not based on stereotyped or generalized perceptions of differences.
Id. at 232.
I now examine the Commonwealth's Proposed Remedial Plan to determine whether it comports with the controlling legal principles framed by the Fourth Circuit's remand.

Virginia Women's Institute for Leadership
The Virginia Women's Institute for Leadership ("VWIL") plan envisions a parallel program, which takes into account the differences and the needs of college-age men and women. The VWIL plan offers a holistic, residential four-year college experience in an established all-female environment, Mary Baldwin College (MBC). VWIL's stated mission is to produce the "citizen soldier," i.e., women who are trained for leadership in both civilian and military life. Defs.' Ex. 11 at 6. The methods by which this goal could be achieved were the subject of intensive study and planning by professionals who are leaders in the field of designing and implementing educational programs for women.
The Dean of Mary Baldwin College ("MBC"), Dr. James D. Lott, chairs a Task Force which was charged with developing a leadership program suitable for an all-female four-year college. Dr. Lott is an expert in the field of educating women at the college level, as were most of the members of the Task Force who were drawn from the staff and faculty at MBC. Besides drawing on their own experience and expertise, the Task Force made an in-depth study of the published literature on the developmental psychology of women and the cognitive development of women. The Task Force also consulted outside experts, the most notable of which was Dr. Richard C. Richardson, Jr. After a detailed study of the appropriate methods by which the leadership program should be structured, the Task Force determined that a military model and, especially VMI's adversative method, would be wholly inappropriate for educating and training most women for leadership roles. Consequently, the Task Force developed an analogy to the holistic VMI program, bringing together the co-curricular and the curricular to promote the student's development in all phases of her life. See Defs.' Exs. 11, 39.
In lieu of the adversative methods employed by VMI, the VWIL concept proposes a cooperative method which reinforces self-esteem rather than the leveling process used by VMI. VWIL will be a highly structured program but without the extreme adversative VMI components, such as the rat line and breakout. In the opinion of one of the leading experts on the educating of women, Dr. Elizabeth Fox-Genovese, an adversative method of teaching in an all-female school would be not only inappropriate for most women, but counter-productive. Dr. Fox-Genovese's opinion is based on her extensive research which shows that most women reaching college generally have less confidence than men. It is the opinion of the Task Force that the methods adopted for the VWIL will produce the same or similar outcome for women that VMI produces for men. Dr. Fox-Genovese concurs in this assessment. Tr. 247-48 (Fox-Genovese).
*477 In addition to its argument that the VWIL program is not sufficiently similar to the VMI methods to pass constitutional muster, the United States argues that the VWIL program will not attain its stated goals and that the financial planning is fatally flawed. I will address these objections in turn.

A. Differences between VWIL and VMI.

1. Academic offerings and requirements of VWIL.

The general education requirements and the academic majors, as well as the admission standards, for VWIL students will be the same as those for regular MBC students. Plan at 8. VWIL students must complete a calculus course, either a statistics course or "an appropriate discipline-based quantitative methods course, two science courses with labs, in addition to Biology of Women, and a microcomputer applications course "or the equivalent or by passing a competency test." Defs.' Ex. 39 at 6. VWIL students will take a leadership externship. According to the plan, this externship, "which should ideally be related to [the student's] major," will be distinguished from other externships by providing an opportunity to experience and reflect on leadership in practice. VWIL students will participate in the VWIL seminar, and in Saturday seminars three times a semester. Defs.' Ex. 39 at 8, 15. VWIL students will organize a Leadership Speaker Series for one semester of the junior year and one semester of the senior year. Defs.' Ex. 39 at 15. VWIL students will not attend any classes with male students. Tr. 101, 155 (Lott).
At trial, the government spotlighted the fact that VWIL students will have the opportunity to earn an engineering degree only if they participate in a 3-2 program with Washington University. According to the government this arrangement is constitutionally unacceptable given that VMI offers an engineering degree as well as several advanced math and physics courses that VWIL will not offer. Defendants explained however, that demand at present would not justify an engineering program at MBC. The Fourth Circuit, while amplifying its VMI decision in Faulkner stated explicitly that one of the factors to be considered by this Court in evaluating any proposed remedy is the demand for aspects of a particular program. Faulkner, 10 F.3d at 232. The compelling evidence is that there would be a very slight demand for an engineering program at the all female VWIL. Again, simply because a small handful of women may desire a mirror image VMI, or even an engineering program in an all female environment, does not mean that the Commonwealth is constitutionally obliged to provide such. The Commonwealth has finite resources and it must identify demand for the various alternatives in higher education in the Commonwealth and allocate its resources accordingly.
The very concept of diversity precludes the Commonwealth from offering an identical curriculum at each of its colleges. Thus, in many instances, a prospective student must make a choice between the lifestyle of a college and a preferred course of study. For example, a prospective student may prefer the lifestyle at William and Mary in the eastern part of the state, but wants to study veterinary medicine which is offered only at VPI in the western part of the state. Here, a prospective VWIL student is faced with a similar choice  to go to VPI, a co-ed college which offers an engineering course and has an ROTC component, or to attend VWIL, which is all female, has an ROTC component but no on-campus engineering program. Each of Virginia's colleges cannot be all things to all people. Financial resources do not permit it nor does equal protection require it.

2. VWIL/MBC Residence Life

The residential life for VWIL students will vary significantly from the residential life of VMI students. The Task Force developed a model which will allow VWIL students to move in productive ways between the "walls" of VWIL and the MBC community. Defs.' Ex. 39 at 11-12. Upperclass VWIL students will be required to live for at least one year in the VWIL House. Defs.' Ex. 39 at 14-15. The VWIL House will not be operated on a military format. Defs.' Ex. 11 at 11; Tr. 374 (Tyson). The Task Force rejected VMI's extreme adversative model for the co-curriculum *478 component because that model would not produce the same outcomes for the VWIL population as it does for the VMI population. Notwithstanding these differences, the VWIL program will use the highly disciplined schedule of the VMI model. Defs.' Ex. 39 at 12-14.

3. The Military Component

VWIL requires participation in an ROTC program. The United States argues that the VWIL ROTC component is a pale image of the military lifestyle at VMI, but in making the argument the United States confuses VMI's co-curricular military model of training with its ROTC program.
The only expert to testify on the effectiveness of ROTC programs was Major General Robert E. Wagner. He is a person who has devoted a substantial portion of his career to establishing, evaluating and standardizing ROTC programs in colleges throughout the United States. He compared outcomes of ROTC programs of co-ed colleges which had no military co-curricular lifestyle with the cadets from VMI who participated in ROTC and found no significant difference in the performance of VMI cadets and participants from co-ed colleges. For example, he found that the ROTC participants from the University of Virginia fared as well, and in some cases better, than VMI cadets.

4. VWIL's Benefits/Outcomes

VWIL is a good design for producing female citizen-soldiers and will be unique in the country. Tr. 249-50 (Fox-Genovese). The VWIL experience will not be the entirely militaristic experience of VMI. Instead, VWIL, because it is planned for women who do not necessarily expect to pursue military careers, incorporates the element of public service. Id. Although the United States showed unequivocally that the VWIL program differed from VMI in many ways, no expert for the United States testified that VWIL would not be educationally beneficial for women.
Defendants' witnesses, Dr. Richardson and Mr. Bunting, and United States witnesses, Drs. Conrad and Astin, agree that any given set of outcomes can be obtained by more than a single methodology. Tr. 608 (Richardson); Tr. 1550 (Bunting); Tr. 1076 (Conrad); Tr. 1302 (Astin). VWIL is a pioneering project. As such it cannot, by definition, boast of a VMI type record of producing "citizen soldiers." However, the evidence produced at trial indicates that MBC is committed to providing to the VWIL women benefits that are equal to or better than the benefits provided to men at VMI. As noted supra, MBC, with its experience in women's education and record of unique programs, believes that VWIL will accomplish its mission. Tr. 1529-30 (Tyson).
The government stressed the fact that the Commonwealth has not yet developed a firm methodology for evaluating the VWIL program and argues, therefore, the credibility of the plan is fatally undermined. The expert testimony at trial differed significantly in assessing the expected outcomes of the VWIL program. Perhaps the only conclusion that may fairly be drawn from the testimony in this regard is that attempting to evaluate the VWIL program before it is implemented is of questionable value. According to Dr. Askegaard, evaluating a program is a retrospective exercise and terms like "citizen-soldier" must be operationalized before a program can be evaluated. Because the term "citizen-soldier" has not been operationalized, an assessment plan has not been developed.
Dr. Clifton Conrad, one of the government's experts on curricular and co-curricular education programs, testified that (1) many different means can be used to achieve the VMI outcomes, Tr. 1103-04 (Conrad), (2) his opinions regarding VWIL are informed guesses, and (3) he cannot evaluate the program until it has been implemented. Tr. 1260 (Astin).[5]
*479 The government also offered testimony of Dr. Alexander Astin. Dr. Astin testified that the success of the VWIL program will depend upon who is attracted to the program and who forms the peer group and how the implementation of the program deals with the dilemma of what will be different and unique from the traditional MBC program. Because of these considerations, Dr. Astin concludes it will be difficult to realize VWIL's objectives. Tr. 1260 (Astin).
Dr. Astin testified that the only way to know if VWIL can accomplish its outcomes is to implement VWIL and assess its outcomes. Tr. 1273 (Astin).[6] Dr. Astin conceded that, even if the Commonwealth of Virginia were to create the mirror image of VMI for women, it could not duplicate the alumni network, history, tradition and prestige of VMI. Tr. 1277 (Astin).[7] Finally, Dr. Astin testified, as did Dr. Conrad, that it is possible to achieve a similar educational outcome through different educational methodologies. Tr. 1302 (Astin). Dr. Astin further testified that his conclusions regarding VWIL's future outcome are speculative, Tr. 1287 (Astin), and that educators could reasonably disagree with his conclusion that the VWIL program will not be able to achieve its stated goals. Tr. 1305 (Astin).
Dr. Astin's personal ethical opposition to VMI's current all-male admissions policy impairs his objectivity in evaluating the VWIL program. Indeed, Dr. Astin has admitted that he has "a problem with any institution that excludes applicants on the basis of race or sex," that his "sense of equity and desire for the elimination of sexism and racism conflicts with [his] interest in supporting the most effective forms of education," and that "some compromise in the quality of education is the price we must pay if we are to achieve fairness and equity." Defs.' Ex. 95. Dr. Astin's opposition to VMI's admission policy seems to be somewhat at odds with his flagship publication, Four Critical Years, wherein he extolled the virtues of single-sex education at the college level. The conflict arises from his present personal viewpoint on excluding females from publicly-supported colleges. Indeed, Dr. Astin has stated that because of this strong personal opinion, he would be willing to sacrifice beneficial pedagogical methods which infringe on his view. Defs.' Ex. 95. If I comprehend Dr. Astin's distinction correctly, he believes that single-sex education is beneficial for both men and women, but because of his ethical views it should not be practiced in publicly-supported colleges. In his view, as Four Critical Years bears out, single-sex education should be restricted to private colleges.
By adhering to the public-private distinction, Dr. Astin creates a different ethical quagmire. As Dr. Fox-Genovese pointed out, private colleges are prohibitively expensive for students who come from families that are in the middle and lower income strata of society. Moreover, the public-private shibboleth is more apparent than real. It cannot be gainsaid that private colleges receive substantial infusions of both federal and state money. Thus, the distinction Dr. Astin draws is illusory.
The United States also offered the testimony of Dr. Carol Nagy Jacklin who testified that the plan homogenizes women by assuming that there is an appropriate way to educate women. Tr. 873 (Jacklin). The essence of Dr. Jacklin's testimony can be summarized thusly: Gender is not a useful predictor of learning patterns. Tr. 870-75 (Jacklin). Dr. Jacklin based her statement on her research which, according to her, shows a greater *480 disparity in learning patterns within a gender group than exists between the two gender groups. She proceeded to illustrate her thesis with bell curve graphs as to each of the sexes groups. For both men and women the bell curve was a typical one  small numbers of persons at the beginning and ending with large numbers of persons in the middle. Of interest, however, was a narrow band where there was no overlap between the curve for males and the curve for females. When one thinks about Dr. Jacklin's conclusions, she is stating what educators  indeed, the public in general  have known for a long time; that people are born with varying degrees of ability and drive. It is certainly no revelation that within a given population of males, there will be slow learners, average learners, and fast learners. The same holds true with any given population of females. Thus, the bell curves are not surprising. Moreover, the education experts who find a need for single-sex colleges do not base their opinion on the difference in cognitive abilities of male and females, but rather on developmental and emotional differences between the sexes. See, e.g., 766 F.Supp. at 1434-35 (Liability App. at VI.B)
Dr. Jacklin's testimony was contradicted by most of the evidence in the record.[8] In addition, Dr. Jacklin conceded at least two justifications for single-sex education: (1) men and women are treated differently in the classroom as evidenced by her observation of students at MBC who were passive, while the students she observed at VMI were interactive;[9] and (2) women have more chances for leadership at single-sex institutions. Tr. 887 (Jacklin).

5. Pedagogical Justification for VWIL Program

Several experts in women's education testified that VWIL was a pedagogically sound and justified program. Drs. Richardson, Riesman, and Fox-Genovese furnished testimony supporting the appropriateness of the VWIL program and each expressed the opinion that the VWIL approach towards educating and preparing women leaders was preferable to the VMI approach.
Dr. Fox-Genovese testified that VWIL does not need to use the same methodology as VMI with respect to the rat line and the adversative system and that based upon her study of literature and people, there would be little demand for a female VMI but there would be much more significant demand for VWIL. Tr. 138 (Fox-Genovese). Her personal experience and the "overwhelmingly scholarly evidence"  a portion of which is summarized in Defendants' Exhibit 130A  suggest that young women, by the time they reach college, have less confidence in themselves than young men. Young women, according to Dr. Fox-Genovese, do not need to have uppityness and aggression beaten out of them.[10] Dr. Fox-Genovese further explained that adolescence is a period of emotional stress and statistically, the emotional stress takes the form of delinquency in men and depression in women. According to Dr. Fox-Genovese, anorexia is rampant among young college women, in part because they doubt themselves and so they want to exercise control. The control they feel they can exercise is over their own bodies. This, testified Dr. Fox-Genovese, is a turning of energy inward instead of projecting it outward. She explained that anorexia is self-discipline turned pathological. What young women need to understand is the fit between a predictable order of the outside world and their own tendencies towards self-discipline. Tr. 252 (Fox-Genovese). Thus, she concluded, the adversative model is not appropriate to accomplish this result. Tr. at 250-52 (Fox-Genovese). *481 Finally, Dr. Fox-Genovese testified that it is important for states to maintain tax-supported single-sex educational opportunities because of the expense of private single-sex programs. Public single-sex opportunities will provide the most benefit to poorer women and men who, according to Dr. Fox-Genovese, would probably benefit the most from single-sex education.[11] Tr. 291 (Fox-Genovese).
Dr. Richardson testified that "[T]here is not in the VMI paradigm a place for the woman leader who excels and does those things that women are expected to do now and in the 21st century." Tr. 611-12 (Richardson). Dr. Richardson further testified that he does not believe that the VMI model is achievable from the public policy perspective because it is deficient from the standpoint of attracting a sufficient clientele and from the standpoint of achieving a reasonable degree of acceptance from the Commonwealth.[12]
Dr. Riesman testified that VWIL is a "wholly appropriate way to proceed" to prepare women as citizen-soldiers. Tr. at 539-40 (Riesman).[13] Dr. Riesman opined that the fact that this litigation may end with this new program and VMI still extant is a tremendous achievement, not only for Virginia but for the country. Tr. 474 (Riesman). Dr. Riesman stated, "Given the women now coming to higher education, what is offered in VWIL is a model for the country, with potentially enormous consequences to reverse the unhappy, often unequal, output of coeducation." After evaluating the Commonwealth's plan, Dr. Riesman concluded that VWIL will produce the kind of self-assurance in the face of accomplishment of difficulties that VMI offers and requires of its cadets. Tr. 496 (Riesman).
Given the testimony of Drs. Fox-Genovese, Richardson and Riesman  and the absence of any testimony from the United States' experts indicating that VWIL's methodology is inappropriate or ineffective for women  I find that the differences between VWIL and VMI are justified pedagogically and are not based on stereotyping. This is not to say that some women cannot succeed within a VMI type methodology. The evidence at trial indicated that the VMI methodology could be used to educate women and, in fact, some women  such as the allegorical Jackie Jones  may prefer the VMI methodology to the VWIL methodology. As discussed above, however, the controlling legal principles in this case do not require the Commonwealth to provide a mirror image VMI for women. Rather, it is sufficient that the Commonwealth provide an all-female program that will achieve substantially similar outcomes in an all-female environment and that there is a legitimate pedagogical basis for the different means employed to achieve the substantially similar ends. VWIL satisfies the Fourth Circuit's requirement that the Commonwealth adopt a parallel program for women which takes into account the differences and needs of each sex.

B. Planning Assumptions

The United States' second line of attack on the Commonwealth's plan is that the plan employs faulty financial assumptions.

1. General Assumptions/Enrollment Projections

At trial, the government challenged the planning assumptions underlying the VWIL. According to the government, the assumptions are faulty. Primarily, the government argues the Task Force's working assumption of 25 students in VWIL in the first year for *482 planning purposes[14] is merely a guesstimate without a sound factual basis. I disagree. The Commonwealth acknowledges that the Task Force did not undertake a market study for VWIL, but offers two sound reasons for this. First, MBC's experience in attracting students to the traditional program informed its judgment that an intensified state-supported program would have sufficient appeal to make the program workable. Second, the 25 student estimate is based upon MBC's experience with the PEG program and is also a number beyond which incremental costs per student will not exceed incremental revenues. Tr. 219-20 (Lott).[15] Furthermore, there is no cap on the number of students MBC will accept into VWIL. MBC has additional residential capacity for 100-150, and MBC agrees it will accept VWIL students in lieu of traditional students if it becomes necessary. Tr. 131 (Lott).
MBC has a good record of success in developing and implementing innovative educational programs. The success of MBC's PEG program validates MBC's ability to provide distinct programs and suggests that MBC has the ability to successfully implement the VWIL program.

2. VWIL Financing

The United States also disputes sufficiency of VWIL's financing as presented by Dr. Lott.[16] Dr. Lott, who has experience in planning for new educational programs and in funding new educational programs, testified that the VWIL program is adequately financed.[17]
*483 The United States argues that there is no reason to expect the increased tuition revenues to meet the increased costs of additional students. At trial, however, Dr. Finley stated that the tuition and fees received from new students combined with revenues received from the state contract could accommodate increased admissions. Both Dr. Lott and Dr. Finley are well-experienced in funding new educational programs. They approached the task in the same manner that most businesses use in predicting necessary funds for a new venture, i.e., a pro forma statement based on assumptions of what is likely to occur in the future. The assumptions of Drs. Lott and Finley are reasonable, and that is all that is required at the planning stage.
The United States also argues that the out-of-pocket costs for VWIL students will be greater than those of VMI cadets.[18] This conflicts directly with Dr. Sgro's testimony that the VWIL tuition will cost the same as VMI tuition. Dr. Sgro testified that the Commonwealth of Virginia will provide the same amount of financial support to MBC for in-state cadets in the VWIL program that it provides to VMI on a per full time equivalent student basis. Defs.' Ex. 12; Tr. 667-68 (Sgro).[19]

The Commonwealth's Support of the Remedial Plan
The Commonwealth of Virginia has an avowed policy of offering a diversity of choices in higher education. The Fourth Circuit expressed misgivings as to whether VMI's all-male admissions policy was in fact an official state policy. The record in this case shows the Commonwealth's unambiguous and unequivocal support of single-sex education for men and women. Contrary to the perceptions of many, the Commonwealth's position in this Court has always been supportive of VMI's all-male admissions policy because it adds to the diversity of choices in Virginia's higher education system.[20] This support is evidenced by the affidavits of all of the Commonwealth's top officials entered into the record in this case.
Governor George F. Allen has filed an affidavit in which he states that: "[VWIL] will enhance diversity in Virginia higher education and provide for the women of the Commonwealth a unique and innovative educational alternative." Defs.' Ex. 1 at 1-2.[21] Former Governor L. Douglas Wilder filed an affidavit approving the remedial plan, Defs.' Ex. 5, and has commented that "I and my *484 staff have worked closely with Mary Baldwin College and VMI in crafting a program to remedy the discrimination.... [and VWIL] extends to women across our Commonwealth the benefit of a single-sex education which Virginia presently makes available to men at VMI." Defs.' Ex. 11-R at 2. Lieutenant Governor Donald S. Beyer, Jr. has also filed an affidavit supporting the remedial plan stating that VWIL "will enhance and contribute to the diversity of educational opportunities which are available to college-age women in Virginia and will make Virginia a leader in providing such opportunities to women. Diversity of educational opportunity is a hallmark of the Virginia system of higher education." Defs.' Ex. 2 at 1. Attorney General James S. Gilmore, III. has also filed an affidavit supporting the remedial plan as have J. Paul Councill, Jr., the Chairman of the House of Delegates Education Committee, and Elliot S. Schewel, Chairman of the Senate Education Committee. Virginia's Secretary of Education, Dr. Beverly H. Sgro supports the Proposed Remedial Plan because it provides diversity of education in Virginia, which is one of the primary goals of Virginia as stated in the Report of the Commission on the University in the 21st Century. Defs.' Ex. 213. The State Council on Higher Education has also indicated its support of the Proposed Remedial Plan stating that it would be "pleased to work with the administration of [MBC] to develop the strongest possible program should the proposal submitted to the court be judged acceptable." Defs.' Ex. 8. Finally, that the Commonwealth's 1994-96 budget bill, which funds the remedial plan and passed both houses of the legislature, indicates clearly the Commonwealth's support of single-sex education for women and men. In short, every person in Virginia officialdom who has or has had the authority to affect Virginia's policies on higher education has spoken in favor of diversity by offering single-sex education to men and women of the Commonwealth and have strongly supported VWIL.

Conclusion
VWIL is a new venture and no one can predict with certainty its outcome. The evidence, however, supplies a reasonable basis for predicting success in attaining its stated goals. No doubt the program will need further adjustment as experience dictates; however, according to Dr. Lott, the program is fully developed conceptionally and ready to be implemented for the Fall of 1995. During the implementation of VWIL, it will remain under the supervision of this Court.
The Commission on the University in the 21st Century has recommended that "private colleges and universities should be encouraged to expand enrollment (in response to projected increases of college-bound students), supported by the Tuition Assistance Grant Program and the contract for services program." Defs.' Ex. 213. In exercising its sovereign prerogative to structure its system of higher education, the Commonwealth has determined to follow the recommendations in the Report of the Commission on the University of the 21st Century by providing diversity in education and utilizing the talents of private colleges within its borders. Defs.' Ex. 11 at 4. In so doing, it has chosen to maintain VMI as an all-male institution and, through VWIL, to maintain an all-female institution.[22]See generally, Defs.' Ex. 11.
If VMI marches to the beat of a drum, then Mary Baldwin marches to the melody of a fife and when the march is over, both will have arrived at the same destination. The defendants' Proposed Remedial Plan will be approved.
An appropriate order will enter.

ORDER
For the reasons stated in the Memorandum Opinion filed contemporaneously with *485 this Order, it is hereby ADJUDGED and ORDERED that:
1. Defendants' Motion to approve their Proposed Remedial Plan is GRANTED;
2. Defendants' are directed to proceed with all deliberate speed in implementing the Plan and to have the Plan operational for the academic year commencing in the Fall of 1995;
3. the Court will retain jurisdiction in order to supervise implementation of the Defendants' Plan;
4. Defendants' will be required to submit status reports apprising the Court of the progress of the Plan implementation every six (6) months;
5. this ruling is dispositive of all pre-trial motions.

APPENDIX: FINDINGS OF FACT

 I. Witnesses ............................................................ 486
 A. Expert Witnesses ................................................ 486
 B. Fact Witnesses .................................................. 490
 II. The Proposed Remedial Plan ........................................... 491
 A. Development of VWIL Program at Mary Baldwin College ............. 491
 B. Contract for Services ........................................... 492
 C. Cooperation with VPI ............................................ 493
 D. MBC' Commitment to VWIL ......................................... 493
 E. Further Development of VWIL ..................................... 493
III. Status Report/VWIL Program Specifications ............................ 493
 A. Mission of VWIL ................................................. 493
 B. Academic Offerings and Requirements of VWIL ..................... 494
 C. Military Leadership and Training ................................ 494
 D. Physical Education and Training ................................. 495
 E. Co-Curriculum ................................................... 496
 F. VWIL/MBC Residence Life ......................................... 497
 G. VWIL's ROTC Component ........................................... 497
 H. Endowment ....................................................... 499
 I. VWIL Access to VMI Alumni Network ............................... 499
 IV. Mary Baldwin College (MBC) ........................................... 499
 A. History/Background .............................................. 499
 B. MBC Facilities .................................................. 501
 V. VMI .................................................................. 502
 VI. Differences Between VWIL and VMI ..................................... 502
 A. Faculty ......................................................... 502
 B. Endowment ....................................................... 502
 C. Physical Training Facilities .................................... 503
 D. Academic Programs ............................................... 503

The findings of fact set forth in this Appendix fall into three categories: (1) the curriculum vitae of each of the expert witnesses and a description of the fact witnesses for each side; (2) a description of the VWIL plan; and (3) a profile of Mary Baldwin College and how it compares with VMI.
Because a great majority of these findings are historical facts and are essentially uncontroverted, I found it convenient to use the format and much of the substance of the Defendants' Proposed Findings of Fact. Virtually all of these findings provide references to the record for their support.
Unless otherwise indicated, all references to exhibits and trial transcripts refer to the *486 remedial phase of this litigation. Transcript citations refer to the unofficial transcript.

I. WITNESSES

A. Expert Witnesses

(i) Defendants' Expert Witnesses
1. Lewis D. Askegaard testified as a defense expert in educational assessment. He earned a B.A. in English, a Master of Education Degree in Curriculum, and a Ph.D. in Educational Evaluation from the University of Virginia. He has participated in a number of federally funded assessment projects, has trained educators and social workers in assessment methodology, has assisted the State of Virginia in designing assessment strategies, has served on numerous evaluation committees for the Southern Association of Colleges and Schools, has served on the Steering Committee of the Virginia Assessment Group, and is recommended by the Southern Association of Colleges and Schools as an expert in assessment. Currently, Dr. Askegaard serves as Associate Dean of Mary Baldwin College, Registrar, and Director of Institutional Research. Tr. 1361-65 (Askegaard); Defs.' Ex. 110.
2. Josiah Bunting, III, testified as a defense expert in higher education with concentration on single-sex education, and as an expert in leadership. He graduated from VMI in 1963, won a Rhodes Scholarship, and earned an M.A. at Oxford. He served in the United States Army from 1966 to 1972, serving in the infantry, and as Assistant Professor at West Point. From 1972 to 1973, he was Professor and Acting Head of the Department of Strategy, U.S. Naval War College. From 1973 to 1977, he served as President of Briarcliff College, then an all-female college. From 1977 to 1987, he was President of Hampden-Sydney College, an all-male college. Since 1987, he has served as Head Master of The Lawrenceville School, a private preparatory school in Lawrenceville, New Jersey, where he presided over the school's change in status from single-sex to coeducational. Mr. Bunting served as a defense expert in the liability phase of this case. Tr. 1536-39 (Bunting); Defs.' Ex. 111.
3. Paul O. Davis testified as a defense expert on human physiology. Dr. Davis served as a defense expert in the liability phase of this case. He earned a Bachelor's Degree from Columbia Union College, a Master's Degree in physical education from American University, and a Ph.D. from the University of Maryland College of Health and Human Performance, Department of Kinesiology, with a major in exercise physiology and a minor in research design and statistics. He has taught physical education to both sexes at the elementary school, junior high school and high school levels, and has taught applied physiology at the University of Maryland. Liability Tr. 879-84 (Davis). He is a Fellow of the American College of Sports Medicine. Tr. 1399-1400 (Davis). He has consulted extensively for the United States Armed Forces on developing physical training programs for men and women. Liability Tr. 882-84 (Davis). Dr. Davis has published prolifically in his field. Defs.' Ex. 113.
4. Donald J. Finley testified as a defense expert in higher education finance in Virginia. Dr. Finley has a Doctor of Education Degree in Higher Education Administration from the College of William and Mary, and Bachelor's and Master's Degrees in Business Administration from the University of Richmond. He has served as Assistant Director of the State Council of Higher Education for Virginia, as Staff Director and Senior Fiscal Analyst for the House Appropriations Committee of the Virginia General Assembly, as Deputy Secretary of Finance for the Commonwealth of Virginia, and as Secretary of Education for the Commonwealth of Virginia under Governor Robb and Governor Baliles. Dr. Finley presently serves as Associate Director of the State Council of Higher Education for Virginia, with responsibility for finance and facilities. Tr. 1450-58 (Finley); Defs.' Ex. 114.
5. Elizabeth Anne Fox-Genovese testified as a defense expert in women's issues, feminist theory, gender, higher education with particular reference to women's education, *487 single-sex education and curriculum development, and the history of American women. She is currently professor of history and Eleonore Raoul Professor of the Humanities at Emory University in Atlanta, Georgia. She is also an associate member of the English Department, a core member of the Women's Studies Department, and a member of the Comparative Literature faculty.
Dr. Fox-Genovese began her work in women's studies as an assistant professor at the University of Rochester, where she taught one of the first courses nationally in Women's History and developed an interdisciplinary minor in Women's Studies. In 1980 she moved to the State University of New York at Binghamton to help design the first graduate program in Women's History in the country. In 1986, she was selected in a national search to become Founding Director of Emory University's Women's Studies program, which encompasses an undergraduate minor, an undergraduate major, graduate degrees, and certifications in Women's Studies.
She has published a number of books, including Feminism Without Illusions: A Critique of Individualism (University of North Carolina Press, 1991) and Within the Plantation Household: Black and White Women of the Old South (University of North Carolina Press, 1988), 45 articles, and numerous lectures. She has been selected by the United States to direct a national project on women in history, serves as a member of the Steering Committee of the Holmes Group to study the state of contemporary education, served as a member of the Steering Committee for the National Assessment Project, serves as a member of the Steering Committee of the National History Standards Project, and serves as a board member of the American Academy for Liberal Education, which is developing new accreditation standards for small liberal arts colleges. Tr. 225-35 (Fox-Genovese); Defs.' Ex. 115.
6. James D. Lott testified as a defense expert in higher education, single-sex education, leadership education for women, curriculum and program development. Dr. Lott serves as Dean of the College at Mary Baldwin College. He received his B.A. from the University of Tennessee, M.A. from Vanderbilt University and a Ph.D. at the University of Wisconsin. He has taught for 30 years at MBC. In his 30 years of experience at a women's college, he has developed expertise in curriculum development, single-sex education, women's cognitive, moral, and leadership development, and the development of new programs, including financial planning. Tr. 52-67 (Lott); Defs.' 116.
7. Richard C. Richardson, Jr., testified as a defense expert in higher education, with particular expertise and hands-on experience in developing academic co-curricular programs and in public policy and higher education. Tr. 603-06 (Richardson). Dr. Richardson is also an expert in women's education. Tr. 640 (Richardson). He is Professor of Educational Leadership and Policy Studies at Arizona State University. He holds a B.S. degree in education from Castleton State College, an M.A. from Michigan State University, and a Ph.D. from the University of Texas. He served in the Marine Corps for three years. He taught at an all-female college, Vermont College, from 1958 to 1961, and has both professorial and administrative experience at several colleges and community colleges, including institutions with large minority populations. His publications include Creating Effective Learning Environments: State Policy and College Learning (Denver, Co., Education Commission of the States, March 1993); Improving State and Campus Environments for Quality and Diversity: A Self-Assessment (with Matthews and Finney, Denver, Co., Education Commission of the States, 1992); Promoting Fair College Outcomes: Learning from the Experiences of the Past Decade (Denver, Co., Education Commission of the States, 1991); Achieving Quality and Diversity: Universities in a Multicultural Society (with E.F. Skinner, New York, ACE/McMillan, 1991); and Fostering Minority Access and Achievement in Higher Education: The Role of Urban Community Colleges and Universities (with L.W. Bender, San Francisco, Jossey-Bass, 1987). He testified as a defense expert in the liability phase of this case. Liability Tr. 661-66 (Richardson). He *488 has also been retained by the United States to testify on its behalf in race discrimination lawsuits involving higher education. He has served as chair of 25 evaluation teams on behalf of regional higher education accreditation boards, including the team that most recently evaluated West Point. Defs.' Ex. 118. His research in the past 10 years has focused on "the impact of students on colleges and the impact of colleges on students." Liability Tr. 664-65 (Richardson).
8. David Riesman, Henry Ford II Professor of Social Sciences, Emeritus, at Harvard University, testified as a defense expert in sociology, with a particular emphasis on culture, personality and character, higher education in the United States and single-sex education for women. Tr. 506-07 (Riesman). He holds a bachelor's degree from Harvard College, a law degree from Harvard Law School and honorary degrees from more than twenty institutions. After completing a year of postgraduate study, he served as the last law clerk to Justice Louis D. Brandeis of the United States Supreme Court. He taught at Buffalo School of Law, and served as a research fellow at Columbia Law School in sociology and anthropology. He joined the faculty at the University of Chicago in 1946, and returned to Harvard in 1958. He is regarded as "one of the first and still is one of the most influential among social scientists who have systematically applied the concepts of culture and personality to contemporary society. His book, The Lonely Crowd, is highly acclaimed in the field, and his concepts of `inner-directed' and `other-directed' [personalities] have been incorporated into the general vocabulary." Liability Tr. Defs.' Ex. 8 at 29. He has focused his research in recent years on the development and present state of American higher education. Clark Kerr, head of The Carnegie Foundation on Higher Education, described Dr. Riesman as "the best informed, most insightful, most interesting commentator on higher education in the United States. And he has no peer in any other nation." Defs.' Ex. 124. His many publications include The Lonely Crowd (1950); Constraint and Variety in American Education (1956); The Academic Revolution (with Christopher Jencks 1968); and On Higher Education: The Academic Enterprise in an Era of Rising Student Consumerism (with several collaborators 1980). His latest book is Choosing a College President: Opportunities and Constraints (1990). Dr. Riesman served as a defense expert in the liability phase of this case. Defs.' Ex. 119.
9. Cynthia Haldenby Tyson testified as a defense expert in single-sex education for women, women's educational development and women's leadership development. Dr. Tyson is President of Mary Baldwin College. She previously served as Vice President for Academic Affairs, Dean of the College, Chairman of the Division of Humanities, and English Professor at Queens College, Charlotte, North Carolina (then a women's college), as well as Associate Professor of English at Seton Hall University (then a men's college). She received her B.A., M.A. and Ph.D. degrees from the University of Leeds in England. Dr. Tyson has spent 25 years focusing on the education of women at two women's colleges as a teacher and an administrator. She has written and lectured widely on women's education. She has also received certificates in advanced studies for college administrators at Harvard University. Dr. Tyson has served as president of the Southern Association of Colleges for Women and as a commissioner of the Southern Association of Colleges and Schools. Tr. 358-67 (Tyson); Defs.' Ex. 121.
10. Major General Robert Edwin Wagner, U.S. Army (Retired), testified as a defense expert on leadership in the military. Tr. 565 (Wagner). General Wagner currently serves as Executive Assistant to the President of Norfolk State University, a predominantly Black institution. Before his recent retirement from the military, General Wagner served as Commanding General of the United States Army ROTC Cadet Command where he supervised all of the Army's pre-commissioning training. A liberal arts graduate of VMI, Major General Wagner served 33 years as an armor officer, in positions ranging from platoon leader to assistant division command. He spent three years in *489 Vietnam. Tr. 550-66 (Wagner); Defs.' Ex. 122.
11. Heather Anne Wilson testified as a defense expert in the psychological, social, emotional and intellectual development of college women. Dr. Wilson is Dean of Students at Mary Baldwin College, responsible for residence life, student activities, international students, housing and counseling. She holds a B.A. in English from Bucknell University, a Master's degree in Counseling from Boston University, a Master's in Institutional Research and Planning from Columbia University, and a Doctorate in Higher Education from Columbia University. The primary focus of her 20 years' experience in higher education has been the education and development of women. She has worked at coeducational and single-sex colleges  the University of Arkansas, Oklahoma State University, Marymount College in New York City and Clarkson University. Her experience includes work both as a counselor to women students and as a supervisor and developer of counseling services for women students. She has also been involved in developing leadership programs for women. Tr. 326-33 (Wilson); Defs.' Ex. 123.

(ii) Government's Expert Witnesses
1. Alexander William Astin testified as a Government expert in higher education, assessment and the comparability of higher education programs. He received his Bachelor's Degree from Gettysburg College and his M.A. and Ph.D. Degrees from the University of Maryland. Dr. Astin is currently Professor of Higher Education at the University of California at Los Angeles and Director of the Higher Education Research Institute there. Dr. Astin's books include What Matters in College? Four Critical Years Revisited (1993); Assessment for Excellence: The Philosophy and Practice of Assessment and Evaluation in Higher Education (1991); Four Critical Years (1977); and The College Environment (1968). Higher Education (1991); Four Critical Years (1977); and The College Environment (1968). Tr. 1216 (Astin).
2. Mr. James Francis Brewer, III, testified as the United States' expert in planning, designing and operating higher educational facilities. Tr. 818 (Brewer). He has been Director of Physical Plant at the University of Maryland at College Park since 1985. He holds B.S. and M.B.A. degrees from the University of Maryland. He testified for the United States in the liability phase of this case. Plf.'s Ex. 9.[1]
3. Clifton Conrad testified as the United States' expert on curricular and co-curricular offerings. Tr. 1040 (Conrad). He is currently Professor of Higher Education and Coordinator of the doctoral program in Higher Education at the University of Wisconsin-Madison, and previously had been on the faculties of the University of Denver, the College of William and Mary, and the University of Arizona. He holds a Bachelor's Degree from the University of Kansas and a Ph.D. in higher education from the University of Michigan. His books and monographs include The Undergraduate Curriculum (1978), Liberal Education in Transition (1980, with Jean Wyer), and Curriculum in Transition: Perspectives on the Undergraduate Experience (1990, with Jennifer Haworth). In 1987-88, he served as president of the Association for the Study of Higher Education. Plf.'s Ex. 7. He testified for the government in the liability phase of this case, and on behalf of the Civil Rights Division on other occasions. In the liability phase this Court concluded that Dr. Conrad's testimony was entitled to "little weight" because his opinions were based on his personal belief that single-sex education, while beneficial, should not be provided by the public sector. United States v. Virginia, 766 F.Supp. at 1412.
*490 4. Carol Nagy Jacklin testified as a Government expert in the psychology of gender, psychology of gender as it relates to learning, developmental psychology and developmental psychology as it relates to learning. Tr. 854-55 (Jacklin). Dr. Jacklin is currently a professor of psychology and Dean of Social Sciences and Communication at the University of Southern California. She received Bachelor's and Master's Degrees from the University of Connecticut and a Ph.D. from Brown University in psychology. She published The Psychology of Sex Differences (1974, with Eleanor Maccoby), a meta-analysis. She is a Fellow of the American Psychology Association and a Fellow of the American Psychology Society. Tr. 851-55 (Jacklin); Plf.'s Ex. 6.
5. Michael S. Kimmel testified as a Government expert in historical sociology and the sociology of gender. Tr. 935 (Kimmel). Dr. Kimmel received his B.A. from Vassar College, his Master's Degree from Brown University, and his Doctorate from the University of California at Berkeley. He is an Associate Professor of Sociology at the State University of New York at Stony Brook and is presently a visiting professor at Berkeley. He has taught, published and lectured in the area of comparative historical sociology of gender. He is currently editor of Masculinity and is President of NOMAS, the National Organization of Men Against Sexism. Tr. 928-35 (Kimmel); Plf.'s Remedy Ex. 8.
6. Larry Lee Leslie testified as the Government expert in higher education finance. Dr. Leslie is Professor and Director of the Center for Study of Higher Education at the University of Arizona. The focus of his academic work has been the economics and financing of higher education. He received his Bachelor's and Master's degrees from the University of Minnesota and his Doctorate in Education from the University of California, Berkeley. Dr. Leslie has testified on three other occasions for the Civil Rights Division. Tr. 731-36 (Leslie); Plf.'s Ex. 4.
7. James A. Peterson testified as a Government expert in fitness training for women. Dr. Peterson currently serves as Director of Sports Medicine for StairMaster Sports Medical Products, a company owned by his brother. He has a B.S. Degree in Business Administration from the University of California, Berkeley, and Master's and Ph.D. degrees in Physical Education from the University of Illinois. He has taught physical education in high schools and colleges. He was in charge of cadet basic training at West Point and was involved with the physical training of women at West Point after coeducation. Remedy Tr. 1114-16 (Peterson). He has also worked at the Women's Sports Foundation at Stanford University. He has written books and articles on fitness training, including the development of certain physiological characteristics in women. Tr. 1111-19 (Peterson); Plf.'s Ex. 3.

B. Fact Witnesses

(i) Defendants' Fact Witnesses
1. Carole Lewis Anderson is a member of the Board of Trustees of Mary Baldwin College. She received a liberal arts degree from Penn State University in 1966 and a Master's degree in Business from New York University in 1976. Ms. Anderson worked as a securities analyst and as a merger and acquisitions specialist in the Corporate Finance Department of Paine Webber. In 1985, she became a corporate director and Senior Vice President in charge of corporate development for Hasbro, Inc. She also served as president of the Infant Products Division. In 1987, she joined MNC Investment Bank in Washington, D.C., as President of the Investment Banking Division. Since 1990, she has operated a financial consulting business in Washington, D.C. Tr. 438-40 (Anderson).
2. Paul D. Maini is the Executive Vice President of the VMI Alumni Association. Tr. 459 (Maini). He graduated from VMI in 1966, served as a career Army officer, rising to the rank of lieutenant colonel. He received a Master's Degree in history at Florida State University, attended the Navy War College at Newport, Rhode Island, taught Army ROTC at VMI and taught Western Civilization at the Naval Academy before returning to VMI. Mr. Maini testified as a fact *491 witness in the liability phase of this case. Liability Tr. 870-75 (Maini).
3. Beverly Huston Sgro became the Secretary of Education for the Commonwealth of Virginia in January 1994. She previously served as Dean of Students at Virginia Polytechnic Institute and State University, as Executive Assistant to the Vice President for Student Affairs, as Assistant Director of Student Activities, and as Coordinator for Greek Affairs at Virginia Tech. She holds a Bachelor of Science degree in Speech Pathology and Audiology from Texas Women's University, and a Master of Science in Management, Housing and Family Development and a Ph.D. in Educational Research and Evaluation, with an emphasis on policy analysis, both from Virginia Tech. Tr. 661-63 (Sgro); Defs.' Ex. 120.

(ii) Government's Fact Witnesses
1. Captain Tamara Frezell, U.S. Army, is a 1989 graduate of the U.S. Military Academy at West Point. She is a native of Petersburg, Virginia. She served in the Quartermaster Corps and is now a member of the West Point staff serving as Equal Opportunity Admissions Officer. Tr. 983-84 (Frezell).
2. Colonel James Siket, United States Army, is a graduate of West Point and a career Army officer. He has a Master's Degree in Business Administration from Auburn University. He is a graduate of the Army War College. He has spent the last six and one-half years as Regimental Tactical Officer and Brigade Tactical Officer at the U.S. Military Academy at West Point.[2]

II. THE PROPOSED REMEDIAL PLAN

A. Development of VWIL at MBC

1. In academic year 1992-93, Dean Lott established a long-range planning process. As part of the process, the faculty informally reexamined MBC's mission and began considering a more deliberate focus on leadership. At the same time, Dr. Wilson increased emphasis on leadership development in the co-curriculum and won a grant to develop a leadership program. Parallel development in the curricular and co-curricular areas prepared MBC for a new venture in leadership formation. Tr. 73-74 (Lott).
2. In midsummer 1993, President Tyson discussed with Dean Lott the possibility of developing a program for the education and training of women citizen-soldiers. Tr. 74-75 (Lott). The purpose was to meet the Commonwealth of Virginia's desire to provide women the access to a single-sex educational program which would prepare them for leadership positions in civilian and military life. Tr. 73-74, 204 (Lott); see also Defs.' Exs. 11, 39. Lott and Tyson examined what VMI meant by the term "citizen-soldier" and used as a starting point the notion that a citizen-soldier is comfortable with and capable of taking on leadership positions in civilian, both private and public, and in military life. Tr. 89-90 (Lott). A four part holistic program is envisioned to produce women citizen-soldiers: the curriculum, the co-curriculum, military training including ROTC, and physical education and training. Tr. 74-75 (Lott); Defs.' Exs. 11, 39. The MBC Board of Trustees' Executive Committee approved the concept in July 1993. Tr. 76 (Lott).
3. President Tyson and Dean Lott then discussed the concept with other members of the MBC executive staff. They were also in contact with Dr. Richardson. Tr. 75, 219 (Lott). At the end of the summer, the MBC executive staff called together twelve senior faculty leaders and reviewed the concept with them. Tr. 75 (Lott). President Tyson also surveyed by telephone the full Board of Trustees during the planning phase. Tr. 76 (Lott); 457-58 (Anderson). The MBC faculty voted to approve the development of VWIL on September 24, 1993. Tr. 75-76 (Lott).
*492 4. On September 24, 1993, MBC entered into an agreement with the VMI Foundation, Inc., which committed to provide funding for VWIL if it receives court approval. Defs.' Ex. 11-N.
5. On September 25, 1993, Dr. Tyson met with the VMI Board of Visitors and reviewed the VWIL concept. The Board of Visitors voted to provide the cooperation and resources of VMI to VWIL and to submit the VWIL proposal in the Proposed Remedial Plan. Defs.' Exs. 11-O, 11-Q.
6. On September 25, 1993, Governor Wilder approved the Plan. Defs.' Ex. 5.
7. As provided in the Plan, President Tyson designated a Task Force co-chaired by Deans Lott and Wilson to refine and plan for implementation of VWIL. The Task Force includes faculty, administration and student representation. Tr. 76-80 (Lott). Members of the Task Force include a political scientist interested in opportunities for women in political life and experienced in using quantitative methods in approaching problems; a professor of sociology and anthropology, with a particular interest in cultural and societal structures; the college residence life coordinator, who has particular expertise in developing women's leadership programs; an MBC alumna and professor of theater who understands the need for both cooperative and command leadership; a student in the class of 1996 who is a resident advisor and leader in her own right; and a professor of philosophy with a strong interest in leadership ethics. The Committee also calls on ad hoc members as particular expertise is needed in the areas of physical education and training, ROTC and developmental psychology. Tr. 80-82 (Lott); Defs.' Ex. 39 at 17.
8. The Task Force studied leadership issues and the research literature on the developmental psychology of women and the cognitive development of women. Task Force deliberations focused on issues of leadership and the question whether women lead and learn differently than men. The Task Force prepared a bibliography and summaries of literature reviewed by the Committee. The Task Force integrated its collective experience with the research literature. Tr. 83-85, 87-88 (Lott); Defs.' Ex. 131.
9. All elements of the faculty, staff and students came together to design the program and to talk about each other's areas. Dean Wilson, in charge of student life, could offer her thoughts on curriculum. The faculty could offer their thoughts on student life. Tr. 335 (Wilson). The Task Force developed an analogy to the holistic VMI program, bringing together the co-curricular and the curricular to promote the student's development in all phases of her life. Tr. 110 (Lott). It is an intentionally designed program where all the elements promote the same goals and values, a more intentionally holistic program than the traditional MBC program. Tr. 334-35 (Wilson).
10. From late October to January 17, the Task Force met six times. Members also worked independently. Dean Lott spent close to half his working hours on the VWIL development. Tr. 82 (Lott).
11. Dean Lott and Dean Wilson visited VMI twice. Other Committee members also visited VMI. Tr. 84 (Lott). The Task Force reviewed the assessment materials from VMI and examined the VMI methodology and outcomes. Defs.' Exs. 25, 26, 65; Tr. 87 (Lott). The Task Force considered carefully, in light of their collective experience and the literature on women's education, where VWIL should follow or depart from the VMI methodology to produce the same outcomes. Tr. 83-85 (Lott). On visits to VMI, they observed VMI's holistic education which integrates curriculum and co-curriculum. Tr. 85, 110 (Lott).

B. Contract For Services

1. The Plan provides for the Commonwealth to enter into a contract for services with MBC and VMI for VWIL. Defs.' Ex. 11 at 3. Such arrangements have been recommended in a study on the University of the 21st Century commissioned by the General Assembly of Virginia. Defs.' Ex. 213. The study recommends private contracts to eliminate duplication and increase efficiency in higher education. The report also foresaw *493 an increase in the student population in the 1990's and recommended contracts with private colleges as a means by which the Commonwealth could accommodate a growing student population without building additional facilities. Tr. 367-69 (Tyson).
2. Dr. Tyson has authority on behalf of MBC to enter into a contract for services with respect to VWIL. Tr. 369 (Tyson).

C. Cooperation With VMI and VPI

1. VMI has committed to support the VWIL program. On September 25, 1993, the VMI Board of Visitors voted to support MBC's development of VWIL. Dr. Tyson has had periodic conversations with the Superintendent of VMI and the President of the VMI Board of Visitors who have reaffirmed VMI's support. Tr. 369-70 (Tyson).
2. The cooperation to date between VMI and MBC with respect to VWIL has been excellent, that there has been cooperation on many levels, and that VMI has pledged to help in any way MBC asks. Tr. 370 (Tyson). The cooperation between MBC and VMI officials was readily apparent throughout the course of the Phase II proceedings.
3. The Plan provides for establishment of a Joint Advisory Board for Leadership Education between MBC and VMI. The Board will be designed to advance the leadership program and the citizen-soldier concept. It will be composed of faculty, administrators and trustees from MBC and VMI. Among its tasks will be continuous study of the advancement of leadership training at VMI and MBC. There will be evaluation of the assessments and outcomes of the two programs to advance the cause of the citizen-soldier. In addition, the Board will arrange for exchange of faculty and potentially for joint meetings of students in co-curricular settings. Tr. 370-72, 425, 427 (Tyson); Defs.' Ex. 11 at 15-16.
4. Under the Plan, VWIL will also cooperate with Virginia Tech and VMI in the Virginia Corps of Cadets. Defs.' Ex. 11; Tr. 424 (Tyson).

D. MBC's Commitment to VWIL

1. MBC undertook to establish VWIL for several reasons: first, MBC is committed to the education of women in a single-sex environment. Second, MBC faculty have expertise in educating women. They also have experience in innovation. MBC's innovation and creativity characterize it as much as its dedication to single-sex education for women.
2. MBC is committed to continuing the development of VWIL in accordance with the Plan and, specifically, to achieving outcomes comparable to VMI. Tr. 1528 (Tyson).
3. The administration of MBC is professionally and personally deeply invested in the VWIL program and determined to make it succeed. Tr. 344-45 (Wilson).

E. Further Development Of VWIL

1. The Task Force proposes to complete development of the curriculum by the end of the current academic year. Tr. 129-30 (Lott). The Task Force will continue to meet and confer with VMI, particularly with respect to co-curriculum and the physical training programs. Tr. 130 (Lott).
2. With Court approval, it is expected that VWIL will admit its first students in the 1995 fall semester. Tr. 130 (Lott).

STATUS REPORT/VWIL PROGRAM SPECIFICATIONS
The Status Report of January 17, 1994 (Defs.' Ex. 39) sets forth the conclusions of the Task Force and the programmatic components of VWIL. On February 4, 1994, the faculty approved unanimously the Status Report and the continuation of the planning process. Tr. 83-86 (Lott). The Status Report recites that VWIL "is based on a working hypothesis about leadership at the beginning of the 21st Century and about the advantages of single-sex education in the development of the qualities of mind and character of women leaders." Defs.' Ex. 93, at 1.

A. Mission of VWIL

1. The MBC Task Force concluded that VWIL is appropriate to MBC's commitment "to the education of women for a world of expanding opportunity" in ways which "will *494 lead to flexibility of mind and strength of values and provide the foundation for future careers, professions, and positions of leadership." Defs.' Ex. 39 at 4.
2. VWIL will be a publicly-supported, single-sex education program with military training for women.
3. The stated mission of VWIL is to produce "citizen-soldiers who are educated and honorable women, prepared for the varied work of civil life, qualified to serve in the armed forces, imbued with love of learning, confident in the functions and attitudes of leadership, and possessing a high sense of public service." Defs.' Ex. 11 at 7.

B. Academic Offerings and Requirements of VWIL

1. The general education requirements and the academic majors for VWIL students will be the same as those for regular MBC students. Defs.' Ex. 11 at 8.
2. The admission standards for the VWIL would be the same as for the traditional MBC program. Tr. 131 (Lott).
3. VWIL students must complete a calculus course. Defs.' Ex. 39 at 6. MBC currently offers calculus courses, and offered these courses in the 1990-91 school year. Plf.'s Ex. 39 at 79; Plf.'s Ex. 36 at 135-136.
4. VWIL students must complete either a statistics course or "an appropriate discipline-based quantitative methods course...." Defs.' Ex. 39 at 6.
5. VWIL students must complete two science courses with labs, in addition to Biology of Women. Defs.' Ex. 39 at 6.
6. VWIL students must complete a microcomputer applications course "or the equivalent or by passing a competency test." Defs.' 39 at 6.
7. VWIL students will take a leadership externship. This externship, "which should ideally be related to [the student's] major, will be distinguished from other externships by providing an opportunity to experience and reflect on leadership in practice. For instance the student may work for a person whose position she would like to have in ten years and may, in addition to the standard expectations of an externship, be required to keep a journal in which she analyzes and evaluates the leadership styles and strategies she encounters in the externship." Defs.' Ex. 39 at 7; TR 97, lines 13-19 (Lott).
8. VWIL students will participate in the VWIL Seminar, and in Saturday Seminars three times a semester. Defs.' Ex. 39 at 8, 15. VWIL students will also organize a Leadership Speaker Series for one semester of the junior year and one semester of the senior year. Defs.' Ex. 39 at 15.
9. Although eight male non-residential students currently attend some classes with traditional MBC undergraduate women, no male students will attend classes with VWIL students. Tr. 101, 155 (Lott).
10. VWIL students will have the opportunity to earn an engineering degree. Presently, MBC students may participate in a 3-2 program with Washington University. Dean Lott is also "in conversation now with another institution closer-by and [is] moving toward an agreement which would allow a student that option (3-2 engineering)." Tr. 101-02 (Lott). VWIL students would not receive the VWIL tuition discount while participating in the engineering program at Washington University. Tr. 696-97 (Sgro), Defs.' Ex. 12 at 94.

C. Military Leadership and Training

1. All VWIL students will be required to complete four years of ROTC. The program at MBC will be conducted by ROTC professors from VMI. Academic classes will be conducted on the MBC campus by the ROTC faculty, who are active duty military personnel. The content and design of the courses are uniformly directed for all ROTC by the respective Armed Service. In addition to classes, organized laboratory activities will be conducted on designated afternoons either on the MBC campus or at the ROTC facilities on the VMI campus. MBC will provide transportation to and from the VMI campus. Juniors and Seniors who are not candidates for a commission will be required to participate in alternative leadership laboratory activities. *495 Physical training and evaluation activities separate from those directed by the Physical Education Department will be conducted by the ROTC faculty, and the ROTC faculty will provide counseling and advising on the MBC campus on a scheduled basis. Defs.' Ex. 39 at 10.
2. The total number of semester hours credit for four years of ROTC is 12. In addition, a six week intensive summer camp between the junior and senior years will provide externship credit for students seeking a commission. Defs.' Ex. 39 at 11.
3. VWIL students will constitute a corps of cadets. They will have military rank, will wear uniforms and will drill in ROTC and as part of the Virginia Corps of Cadets. Nothing in the VWIL Plan precludes increasing the amount or type of military exercises. Tr. 118-21; 159 (Lott).
4. The Plan provides for establishment of a Virginia Corps of Cadets, comprised of the all-female VWIL, the all-male VMI and the coed Virginia Tech Corps. Defs.' Ex. 11 at 17-18. As members of the Virginia Corps of Cadets, VWIL students will have distinctive military uniforms, different from the ROTC uniform. Tr. 105 (Lott).
5. The Governor of Virginia will be the Commander in Chief of the Virginia Corps of Cadets. The Virginia Corps of Cadets will participate in parades and perhaps field exercises and other activities. Tr. 670 (Sgro).
6. For approximately one week each summer VWIL freshmen must participate in a "cadre week orientation." Plan at 11.
7. VWIL students will not be required to wear uniforms during the school day other than while participating in ROTC or Virginia Corps of Cadets activities. TR 166, lines 15-19 (Lott); TR 409, lines 7-12 (Tyson).
8. Traditional MBC students would not wear military uniforms. TR 166, lines 20-23; 167, line 1 (Lott).
9. VWIL students will not be required to eat meals together. TR 407, lines 21-23; 408, lines 1-7 (Tyson).

D. Physical Education and Training

1. VWIL students must take 8 semesters of physical and health education courses. Defs.' Ex. 39 at 8. These courses are: advanced fitness ("a course designed for VWIL students"); swimming; tennis; golf; racquetball; and "additional physical education courses, and two health courses." Defs.' Ex. 39 at 9.
2. In the sophomore, junior and senior years students will take tennis, golf, racquetball, additional physical education courses, and two health courses. A course in self-defense will be part of the curriculum, and all VWIL students will have training in self-defense and self-assertiveness through a Co-operative Confidence Building program ("CCB") and through the required weekend workshops which will make up an important part of the co-curricular component of the Institute. Defs.' Ex. 39 at 9.
3. All VWIL students will complete a battery of fitness assessments at the beginning of the Freshman year and at the end of all subsequent semesters. The Physical Education faculty will establish a set of standards with appropriate recommendations for a standard of maintenance. The results of the tests will be incorporated into the evaluation of the VWIL student in the health or physical education course she is taking during that semester. Defs.' Ex. 39 at 8-9.
4. The VWIL physical education program will have a self-defense component rather than a boxing component. Tr. 1442 (Davis).
5. VWIL will require tennis, golf and racquet ball because, according to the Task Force, these sports are popular among corporate leaders. Tr. 107 (Lott).
6. The MBC Physical Education Department will develop the CCB as a co-curricular component. CCB will be held twice a week. The CCB was designed to be analogous to the VMI "rat challenge," and will consist of physically and mentally challenging events, including obstacle courses, rappelling, a ropes course, and team building activities. Students enrolled in VWIL will be required to participate in this program their freshman year, unless they are involved with practice *496 for a varsity athletic team. Sophomores, juniors and seniors who are not involved with practice for a varsity team will have the choice of participating in the CCB program as leaders or participating in a personal workout program. The latter will be designed to assure that the student meets and maintains the standard of physical fitness determined by the Physical Education faculty. Defs.' Ex. 11 at 11.
7. The physical training test for women in VWIL is designed to be comparable in rigor and challenge to the physical training test for men at VMI. Tr. 178 (Lott). The VWIL physical and health education component is based on the VMI physical education program. Tr. 106 (Lott).
8. The VWIL Program's physical training component will produce women who are capable of serving physically in the military service. Tr. 443 (Anderson).
9. Physical performance standards will be set by MBC's physical education faculty in consultation and cooperation with the physical education faculty at VMI. National norms and standardized tests for physical fitness will be utilized. The ROTC physical fitness requirements for women are standardized nationwide. Tr. 109, 160 (Lott).
10. Sharon Spalding, a member of the Physical Education Department at Mary Baldwin College, holds a certification as an Exercise Specialist from the American College of Sports Medicine. That certification demonstrates the expertise to design, implement and evaluate a physical education and physical training program. Tr. 1403-04 (Davis).
11. The VMI Physical Education Department possesses the attitude, the resources and an avowed desire to assist MBC in any way appropriate in implementing a comparable program at MBC. Both departments are committed to the VWIL Program. Both departments desire to put in place the comparable program at MBC, as demonstrated by the VWIL requirement of eight semesters of physical education, which is unique in undergraduate education. The two staffs working together have the ability to design, implement and evaluate the VWIL Program so that it will be comparable to VMI's. Tr. 1404-05 (Davis).
12. VMI will make the Rat Challenge facilities available to VWIL. Tr. 1134-35 (Peterson).

E. Co-Curriculum

1. VWIL students will be required to participate in a one-week wilderness-type orientation the summer before their freshman year. The VWIL Orientation will take place the week before regular orientation and will be run by upper class VWIL students. The Orientation will give upper class students the opportunity to plan, to organize, and to lead; and it will provide freshman with a physically and mentally demanding experience which will foster bonding and which will be a paradigm for VWIL itself. Defs.' Ex. 39 at 12.
2. Freshmen VWIL students will room together and will be housed in separate sections of freshman halls to facilitate the development of group identity while also encouraging good relationships and friendships with other freshmen. Freshmen will be subject to a number of rules which will provide an externally imposed order on their daily lives. While the regulations are still being developed, they will include the following: Students will be required to keep their rooms neat (and subject to spot inspection); they will not be allowed to smoke in their rooms; they will not be allowed to change roommates during the first year but will instead be expected to work through any interpersonal problems which arise. They will also have a required study hall from 7 to 9:00 Monday through Thursday. Defs.' Ex. 39 at 12-13.
3. Freshman VWIL students will take many of the same academic courses, will have the same physical education and ROTC experiences, and will work together in teams in the CCB. Defs.' Ex. 39 at 13-14.
4. As MBC students, VWIL participants will be encouraged to participate in MBC activities and class functions, and will be subject to the rules and regulations of the *497 Honor System and the Judiciary System. Defs.' Ex. 39 at 13-14.
5. Throughout the Freshman year, students will be mentored by upper class VWIL students, and, as VWIL develops, the upper class students will play an important role in modifying the design of the freshman year to make it as effective as possible in orienting first year VWIL students to the standards and expectations of the Institute. Upper class students will lead the VWIL contingent of the Virginia Corps of Cadets, will organize and direct the Corps drills, will be responsible for enforcing regulations and maintaining esprit de corps, and will play a central role in the VWIL orientation and in the CCB. Defs.' Ex. 39 at 14.
6. After the Freshman year, VWIL students will be required to live for at least one year in the VWIL House, a residence hall which will also be the center for VWIL meetings and activities: determination of the required residence period in the VWIL House will be made on the basis of program enrollment and VWIL's experience with balancing the considerations of segregation and integration described below. VWIL House residency will provide students with a "lab" for community building and leadership development. VMI Defs.' Ex. 39 at 15.

F. VWIL/MBC Residence Life

1. Rejecting both total segregation and total integration, therefore, the Task Force developed a model which will allow VWIL students to move in productive ways between the "walls" of VWIL and the MBC community. Defs.' Ex. 39 at 12.
2. Upper class VWIL students will be required to live for at least one year in the VWIL House. Defs.' Ex. 39 at 14. The VWIL House will not be operated on a military format. TR 413, lines 19-21 (Tyson). No regulations or requirements have been developed for the VWIL House. Tr. 413, lines 9-15 (Tyson).
3. VWIL students will set their own rules and regulations in the VWIL House, within the larger framework provided by the VWIL code of conduct. Tr. 356 (Wilson).
4. Upper class VWIL students will play the role of mentor and monitor of the freshmen students. Upper class students will orient freshmen and teach them the standards and expectations of VWIL. Tr. 114-15 (Lott).
5. VWIL will have a class system, including the mentoring system, in which upper class students teach and mold freshmen. Tr. 1052-53 (Conrad); 114 (Lott).
6. VWIL residential regulations will be enforced and monitored by upper class students in the program. Tr. 335 (Wilson).
7. Upper class students will lead the VWIL contingent of the Virginia Corps of Cadets, organize and direct the corps' drills, be responsible for enforcing regulations, maintaining esprit de corps and play a central role in the VWIL orientation and the confidence building program. Tr. 114-15 (Lott); Defs.' Ex. 39 at 14.

G. VWIL's ROTC Component

1. The ROTC programs at VMI operate independently of the barracks system and its various components such as the rat line, and nothing about the ROTC programs at VMI is unique to VMI other than the absence of women. United States v. Virginia, 766 F.Supp. at 1424 (Findings III.G.3 and 4).
2. All military training for VWIL students will be mandatory for four years, including participation in ROTC. Tr. 105 (Lott).
3. For VWIL students, military training leading to the opportunity to be commissioned in the armed services will be provided by the ROTC program in which all VWIL students will be required to enroll. The courses in ROTC will be taught at MBC, and the labs in ROTC will be held at MBC. The exceptions to ROTC activities at the MBC campus will be the use of facilities which MBC does not have (for example a rifle range). Tr. 104-05 (Lott).
4. The purpose of ROTC is to combine quality undergraduate education with tough, centralized training focusing upon duty, honor *498 and leadership development. Tr. 567 (Wagner).
5. Army ROTC training is standardized, both on campus and off campus, including summer camp. Tr. 568 (Wagner).
6. At the highest levels, there are similarities among the Army, Navy and Air Force ROTC programs, especially in the kind of leadership that the programs seek to achieve in their graduates. Tr. 560-61 (Wagner).
7. The principles of leadership are the same in all the services. Tr. 565 (Wagner).
8. Army, Air Force and Navy ROTC physical fitness standards and tests are standardized nationwide. Defs.' Exs. 29, 30, 32.
9. The Army ROTC summer camp is a very important training experience that occurs between the junior and senior year in which cadets are put under a regime that rivals Ranger school. Tr. 568 (Wagner).
10. The ROTC program at summer camp does not include an adversative training methodology like the VMI rat line, nor is that methodology necessary to achieve the objectives of Army ROTC. There is no yelling at ROTC cadets to induce stress. Tr. 581-82, 570-71 (Wagner).
11. It is not necessary for a college ROTC student to wear a uniform around the clock to become a successful military leader. Tr. 596 (Wagner).
12. It is not necessary for a college ROTC student to go through a rat line experience comparable to that at VMI to become a successful military leader. Tr. 596 (Wagner).
13. It is not necessary for a college ROTC student to live in a barracks operated with a system comparable to VMI to be successful military leaders. Tr. 596 (Wagner).
14. The majority of officers in the Army are liberal arts majors. The majority of Army platoon leaders, battalion commanders, division commanders who fought in Desert Storm were liberal arts majors. Tr. 580-81 (Wagner).
15. VWIL students will wear ROTC uniforms at designated times. VWIL students will also wear uniforms, different from ROTC uniforms, as part of the Virginia Corps of Cadets at designated times. Tr. 104-05 (Lott).
16. For academic years 1991, 1992 and 1993, there were respectively, a total of 3,924, 3,703 and 3,613 college ROTC cadets enrolled in coeducational residential military corps of cadets. Of these, 234, 222 and 232 were females, respectively. Defs.' Ex. 88.
17. Through the six senior military colleges, four of which are coeducational, for FY 92 and FY 93, the Army commissioned a total of 310 and 302 ROTC cadets, respectively, of which 19 and 8 were females, respectively. Defs.' Ex. 89.
18. For FY 92 and FY 93, the Army commissioned, respectively, a total of 4,699 and 4,284 ROTC cadets from civilian and military college programs, of which 791 and 665 were female, respectively. Defs.' Ex. 89.
19. Army ROTC Cadets are assessed by the Army Accession Board between their junior and senior years. Evaluation packets for each cadet are prepared by the cadet's professor of military science, and concern three general evaluation areas: military performance, academic performance and, very importantly, the recommendation of the professor of military science. Tr. 572 (Wagner).
20. VMI ROTC students scored an average of 35.45 for the period 1988 through 1993 on Accession Board scores. ROTC students from all other colleges or universities scored an average of 35.98. Thus, VMI ROTC students scored marginally below the average for all other colleges and universities on ROTC Accession Board scores for this period. Tr. 579 (Wagner); Defs.' Ex. 89.
21. Women ROTC graduates from military colleges during the period FY 88 to FY 93 scored an average of 36.5 on ROTC Accession Board scores. Women ROTC graduates from all other colleges and universities (civilian) scored an average of 36.1 on ROTC Accession Board scores. The difference is not statistically significant. Tr. 579 (Wagner); Defs.' Ex. 89.
*499 22. Women ROTC graduates from Texas A & M, a military college, performed no better on Accession Board scores than women who went to the University of Virginia, a civilian university. Tr. 578 (Wagner).

H. Endowment

1. MBC's endowment is $20.5 million. Tr. 1543-44 (Bunting).
2. The VMI Foundation will endow the VWIL program with a permanent endowment of $5.4625 million in addition to its other financial contributions. A comparison of MBC's endowment with similar institutions indicates that MBC has an above average endowment. For example, the endowment of Mary Washington College is $15 million. Tr. 1481 (Finley); the endowment of James Madison University is approximately $9 million. Tr. 1481 (Finley); and, the endowment of Radford University is $6 million. Tr. 1481 (Finley).

I. VWIL Access to VMI Alumni Network

1. The VMI Alumni Association has pledged to support MBC and the MBC Alumni Association with respect to VWIL graduates. Tr. 459-60 (Maini); Defs.' Ex. 7.
2. To assist the VMI Admissions Office, the VMI Alumni Association maintains an alumni recruiting network designed to educate young people about the benefits of a VMI education. The VMI Alumni Association will do likewise with respect to VWIL. For example, on college nights where VMI's alumni serve as volunteers, they will provide prospective VWIL students with information about VWIL's military leadership education or advise young women how to obtain it. Tr. 460-61 (Maini); Defs.' Ex. 11-I.
3. Since 1988, the VMI Alumni Association has assisted VMI alumni who find themselves unemployed. The Association has developed a network of business owners, corporations, VMI graduates and non-graduate employers who are interested in hiring VMI graduates. The Alumni Association will make this placement service available to VWIL graduates. Tr. 461-62 (Maini).
4. The VMI Alumni Association publishes a placement newsletter monthly. The newsletter includes all people the Association knows of who are seeking employment. The newsletter is mailed to the members of the placement network in the hope that employers will identify graduates who fit their needs. With the increase of the job opportunities available to women the demand by VMI alumni employers will increase. VWIL graduates will have the same access to the VMI placement network as VMI graduates. Tr. 462-63 (Maini).
5. The VMI Alumni Association has presented a commitment in which it agrees to open its networks to the women who are graduates of VWIL and to insure that they have opportunities available through those networks, as well as opportunities for externships. This commitment will provide opportunities for advancement to VWIL graduates. Tr. 421-24 (Tyson).
6. The relationship contemplated by the two alumni associations is a strong partnership of mutual support and cooperation. The attitude of VMI alumni toward VWIL is extremely supportive. They are committed to making VWIL work. Tr. 464-65 (Maini).
7. The VMI Alumni Association is opening its network to VWIL graduates, providing them with access to leadership positions. Tr. 374-75 (Tyson).

V. MARY BALDWIN COLLEGE (MBC)

A. History/General Background

1. MBC was founded in 1842. Under the leadership of Mary Julia Baldwin. Miss Baldwin enlisted the educator and textbook author Dr. Williams Holmes McGuffey to develop a program of study for women patterned on the curriculum of mathematics, classics and science offered to men at the University of Virginia. Tr. 67-68 (Lott); Defs.' Ex. 69 at 1.
2. MBC possesses those characteristics of single-sex schools that lead to beneficial outcomes praised by the United States Department of Education in its recent study of single-sex schools. Defs.' Exs. 128, 129.
*500 3. MBC has a chapter of Phi Beta Kappa and was the first women's college to be granted a circle of Omicron Delta Kappa Society, which honors leadership, service and scholarship. Defs.' Ex. 11-A at 5, Plf.'s Ex. 27.
4. In the late 1960's and early 1970's, MBC responded to the women's movement. The college broadened its curriculum to include the new options open to women in business and the professions and developed an emphasis on career planning. Defs.' Ex. 11-A at 6, Plf.'s Ex. 27.
5. MBC is committed to the education of women for a world of expanding opportunity. The College has computerized the campus, renovated its main classroom building to enhance the learning climate, developed new facilities for the communications and computer science disciplines and purchased new state of the art equipment for its science labs. It has established the Rosemarie Sena Center for Career and Life Planning. Defs.' Exs. 11-A at 7-8, Plf.'s Ex. 27.
6. MBC is accredited by the Southern Association of Colleges and Schools. The last re-accreditation occurred in the academic year 1987-88. Tr. 70 (Lott).
7. There are 1,327 students currently enrolled in courses offered by MBC. Approximately 600 students are traditional undergraduate residential women students. About 50 students are enrolled in the Program for the Exceptionally Gifted (PEG), a residential program for academically gifted high-school age girls who are taking college-level work. Approximately 60 students are enrolled in the coeducational non-residential Master of Arts in Teaching program. About 25 students are enrolled in the Extension Program in Goochland, Virginia. Approximately 600 students are enrolled in the coeducational Adult Degree Program (ADP) which is a non-residential program conducted at branch facilities. Tr. 71-72 (Lott); Defs.' Ex. 69 at 2.
8. MBC has 73 full-time faculty and approximately 40 part-time faculty. Approximately 44% of the faculty are tenured. The student/faculty ratio in the traditional program is eleven to one. Tr. 72 (Lott).
9. MBC offers 28 undergraduate majors in the arts, sciences, business and mathematics. Tr. 72 (Lott); Defs.' Ex. 11-A at 10-11, Plf.'s Ex. 27. Currently, about 15% of MBC students major in mathematics or science. Tr. 158 (Lott). MBC also offers pre-law, pre-med and teacher education. Defs.' Ex. 69 at 1.
10. MBC offers an engineering degree program in cooperation with Washington University in St. Louis. Students spend three years at MBC and two years at Washington University to complete the requirements for a Bachelor's degree in engineering. Tr. 101 (Lott); 1614-16 (Bunting); Defs.' Ex. 11-A at 12, Plf.s Ex. 27.
11. MBC requires an externship of every student equivalent to three semester hours. Faculty and the Director of the Sena Career Center assist in setting up externships and establishing guidelines to maximize the experiential education. Tr. 100-01 (Lott); Defs.' Ex. 11-A at 10.
12. MBC's NCAA intercollegiate athletic program includes basketball, swimming, field hockey, lacrosse, volleyball and tennis. MBC offers fencing, soccer, track, softball and riding as club sports. Defs.' Ex. 11-A at 152.
13. The residence life philosophy of MBC is that students learn not only from the classroom but from each other in the residence halls which are extensions of the classroom. The residential life is designed to provide an experience in flexibility, creativity, accountability and compassion with goals of personal growth and development and self-responsibility in the living community. Students run the residence halls, making their own rules and regulations within the larger framework of MBC's code of conduct, and with the guidance of staff. Freshmen have far less autonomy than upper class students. Tr. 356-57 (Wilson); Defs.' Exs. 67 at 1, 82.
14. More than 150 leadership positions are available to the women of MBC through student government, residence halls, class *501 offices, interest groups and athletics. Defs.' Ex. 11-A at 151.
15. The average combined SAT score of MBC entering freshmen is approximately 930. The VMI Defendants' Objections and Responses to the United States of America's First Set of Interrogatories on Remand at 23 (¶ 38) and 24-25 (¶ 42) (filed 10/22/93); Tr. 303-07 (Fox-Genovese); 653-54 (Richardson). This approximately 100 point differential from VMI is within 30 points of the national average differences between young women and young men. Tr. 1544-45 (Bunting).
16. MBC has been listed among the top ten liberal arts colleges in the Southeast four times in the last eight years by U.S. News and World Report. The magazine uses a quantitative methodology and makes its comparison based on five measures: reputation based on a survey of 2,600 college presidents, deans and admission officers nationwide; financial resources, including educational and general expenditures per student, and endowment; selectivity, including SAT scores and acceptance percentage; faculty resources, including faculty preparation; and graduation rates. Tr. 1373-74 (Askegaard); 1618 (Bunting); Defs.' Ex. 125. MBC also has been listed in Best Buys in College Education, published by the New York Times. Tr. 1374 (Askegaard).
17. MBC has a record of success in developing new programs and operating distinctive and unique programs within the larger traditional undergraduate residential community. For example, the Program for the Exceptionally Gifted (PEG) was introduced in 1984. PEG is a unique residential program for academically gifted, high school age girls. Over fifty students are presently enrolled in the program and reside together in a separate residence hall with its own regulations. The program is unique in that it is the only early college program in the United States that acknowledges the academic, emotional and developmental needs of young women. The traditional MBC residential program has proven a compatible and supportive setting for PEG. Defs.' Exs. 69 at 2, 78.
18. Mary Baldwin College is not a military school. Tr. 399, lines 17-19 (Tyson).
19. Mary Baldwin has no tradition of producing military leaders, or of training its students for the military. Tr. 146, lines 10-12; 149, lines 16-17 (Lott); Tr. 406, lines 2-5 (Tyson); Tr. 584, lines 21-23; 585, lines 1-8 (Wagner).
20. ROTC is currently available to Mary Baldwin College students through the program at James Madison University, although in the past three years no MBC student has been commissioned.
21. Currently, there is one MBC student participating in ROTC. Plf.'s Ex. 39 at 117; Tr. 405, lines 2-4, lines 18-19 (Tyson); Defs.' Response to U.S. First Set of Interrogs. on Remand, No. 22 (10/22/93).
22. MBC is already geared in the direction of trying to encourage women to persist in math and physics. Tr. 478-79 (Riesman).
23. Neither MBC nor VMI is a research institution. They are institutions whose missions are to educate; they are fundamentally pedagogical in that they focus on teaching, rather than research. Tr. 244-45 (Fox-Genovese).

B. MBC Facilities

1. MBC has a 55-acre campus in Staunton, Virginia for its undergraduate residential program for women. The campus includes the facilities of the former Staunton Military Academy ("SMA"), which MBC purchased in the late 1970's. Tr. 134-35 (Lott); Defs.' Ex. 11-A at 6.
2. There are sixteen residence halls on the Mary Baldwin campus, which together house about 650 students. Students have a wide range of living arrangements from which to choose, including traditional residence halls, college-owned apartment buildings, and converted single-family dwellings. Tr. 825, lines 3-10 (Brewer); Plf.'s Ex. 39 at 147-148.
3. The traditional residence halls house from about 40 people to about 160 people, *502 and no two residence halls are alike. Each has different room configurations, room sizes, capacities and decor. Residence halls are elegantly equipped with brass chandeliers, plush carpeting and mahogany furniture. Tr. 826, lines 12-23 (Brewer); Plf.'s Ex. 43 at 4.
4. About half of Mary Baldwin's residence halls are converted single-family homes, which are located on campus or in the residential areas immediately adjacent to the campus. Each houses from five to sixteen students, has its own distinct character, and is completely furnished by the college. Tr. 825, lines 8-11; 827, lines 13-23  Tr. 828, line 1 (Brewer).
5. There are also two theme houses  "special interest houses"  for upperclass students, one for honors students and one for community volunteers, both of which are equipped with televisions, cable hook-ups and microwave ovens. Plf.'s Ex. 43 at 6; Plf.'s Ex. 39 at 148.
6. MBC provides a wide variety of options to students who wish to entertain male visitors. Six residence halls have "unrestricted" or 24-hour visitation, with 72-hour overnight visitation for males visiting Mary Baldwin students. Six residence halls have "unrestricted" weekends (Friday 1:00 p.m. to Sunday 11:30 p.m.) and "regular" hours weekdays (Monday-Thursday 5:00 p.m. to 11:30 p.m.). The remaining have regular hours with more limited weekend privileges. Plf.'s Ex. 39 at 148; Plf.'s Ex. 43 at 6-7.
7. About 18 percent of the rooms on the Mary Baldwin campus are single rooms. Tr. 827, lines 6-9 (Brewer).
8. At MBC, the largest bathroom serves approximately 35 or 40 students. At VMI there is one bathroom on each stoop, serving up to 400 students.
9. At MBC, each shower or tub has a door or curtain, while at VMI there are gang showers containing about 24 heads.
10. At MBC, each residential room has a solid door with a lock. At VMI the barracks rooms doors have windows and are unlocked. Tr. 830, lines 13-22  Tr. 831, lines 1-14 (Brewer).
11. Tullidge Hall, a SMA barracks, is one of the residence halls which may be used for the VWIL program. It can house approximately 50 students. Tr. 137 (Lott). MBC has capacity for 100-150 additional residential students. Defs.' Ex. 11 at 12.
12. The Pearce Science Center has 32 laboratories. Tr. 138 (Lott).
13. MBC provides a total of eight computer laboratories with more than 100 individual student computers on campus. Tr. 138 (Lott).
14. The MBC Physical Activities Center is a 40,000 square foot physical education facility which includes four racquetball courts, two gymnasiums, locker rooms, a fully-equipped weight training room, fencing facility and athletic training room. Outside are several playing fields. The King Building houses a gymnasium and swimming pool. Swimming facilities are available also in the olympic-size pool at the Staunton Racquet Club, three blocks from campus. There are a dozen lighted tennis courts. Tr. 139-40 (Lott).

V. VMI
For a Complete record of the Findings of Fact regarding VMI, see this Court's opinion at 766 F.Supp. 1407. Those findings of fact were affirmed by the Fourth Circuit at 976 F.2d 890.

VI. DIFFERENCES BETWEEN VWIL AND VMI

A. Faculty

1. MBC maintains a faculty holding significantly fewer Ph.D.'s than the faculty at VMI. While 86% of VMI's faculty holds Ph.D's, 68% of MBC's faculty hold such degrees. Tr. 768 (Leslie).

B. Endowment

1. In fiscal year 1989-90, the VMI fund and plant revenues reflect the amount of approximately $4,751,310 from the VMI Foundation. Stip. 207. The Foundation completely funds the VMI Keydet Investment *503 Club which is a $200,000 academic program. Stip. 209.
2. Direct aid and support to VMI by the VMI Foundation and affiliated agencies for 1987-88 totalled $6,765,859; for 1988-89 totalled $7,225,755; and for 1989-90 totalled $7,703,775. Ans. to Int. 15, the VMI Foundation, Inc. and VMI Alumni Association's Responses to the Second Set of Interrogatories Propounded by the United States (12/11/90) at 17-18.
3. MBC has an endowment of approximately $19 million, VMI has the largest endowment on a per student basis than any other undergraduate institution in the nation  $131 million. Tr. 770 (Leslie). There is also a difference in the projected endowments of the two institutions based on future commitments; whereas VMI will add an additional $220 million dollars through these commitments, MBC will add $35 million. Tr. 770 (Leslie).

C. Physical Training Facilities

1. MBC has seven tennis courts and two multi-purpose fields for field hockey, lacrosse, and soccer. One gymnasium contains a basketball court, four racquetball courts, a weight room, a billiard and ping-pong room, and a multipurpose room that is used for aerobics, dancing and fencing. Tr. 837 (Brewer).
2. VMI, on the other hand, has eight tennis courts; an NCAA competition level indoor track and field facility; a number of multi-purpose fields; baseball, soccer and lacrosse fields; an obstacle course; large boxing, wrestling and martial arts facilities; an 11-laps-to-the-mile indoor running course; an indoor pool; indoor and outdoor rifle ranges; and a football stadium that also contains a practice field and outdoor track. Tr. 839, Tr. 840 (Brewer).
3. Mary Baldwin's basketball court, similar to a high school gym, seats approximately 400-500. VMI has four basketball courts, including one facility that contains television hook-up capability and seats approximately 5,000. Tr. 838 (Brewer).
4. VMI's weight room has twice the number of stations and is probably between three and four times the size of the weight room at Mary Baldwin. Tr. 839 (Brewer).

D. Academic Programs

1. VMI offers undergraduate degrees in liberal arts, the sciences and engineering. Stip. 115. VMI has one of only five engineering programs in the Commonwealth of Virginia that are accredited by the Accreditation Board of Engineering and Technology, Inc. Stip. 117.
2. Mary Baldwin College does not offer a bachelor of science degree. Tr. 156 (Lott). Mary Baldwin College does not offer engineering on campus. Tr. 157 (Lott). MBC does not have a math and science focus; only about 15% of all current MBC students major in math or science. Tr. 157, Tr. 158 (Lott). VWIL students who wish to earn a degree in engineering must travel to Washington University in St. Louis, Missouri to obtain it. Tr. 101, 157 (Lott).
3. VWIL students interested in obtaining an engineering degree through the cooperative program with Washington University would not receive the tuition discount during their two years in St. Louis; they would have to pay the private tuition fees that are required and thus would be denied the opportunity to receive an engineering degree on a publicly-supported basis like VMI students. Tr. 696, Tr. 697 (Sgro).
NOTES
[1] Additional findings of fact are set forth in the Appendix to this Memorandum Opinion.
[2] The United States continues to maintain that the only action by the Commonwealth which will comport with the Equal Protection Clause is to admit women to VMI. This was the remedy the United States sought in its Complaint, and it has never wavered from it. The United States called the Court's attention to the recent decision in J.E.B. v. Alabama, ___ U.S. ___, 114 S.Ct. 1419, ___ L.Ed.2d ___ (1994). This case does not change the equal protection jurisprudence applicable to the intermediate scrutiny test as applied to sex-based classifications. The Court, in its plurality opinion, reaffirmed the test as set forth in Mississippi University for Women v. Hogan, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982). The Court found the respondent had failed to meet the first prong of the test, i.e., that sex-based peremptory challenges are not an important governmental objective.
[3] The United States does not use the phrase "separate but equal" but that is the import of its argument.
[4] This is the title assigned to the Commonwealth's Proposed Remedial Plan.
[5] Dr. Conrad was asked by the Justice Department to analyze whether VWIL will provide to women benefits comparable to those provided to men at VMI. Tr. 1041 (Conrad). With respect to the components of the VWIL program, Dr. Conrad testified only that each is not "fully comparable" to VMI. Tr. 1047-51, 1061, 1063, 1067 (Conrad). Dr. Conrad testified that VMI and VWIL are not comparable in that there are differences. Dr. Conrad stated that he did not think that one program is better than the other. Further, Dr. Conrad testified on cross-examination that he does not consider himself an expert in single-sex education. He has not studied whether single-sex programs for women are different from single-sex programs for men. Tr. 1090-91 (Conrad).
[6] Dr. Astin testified that the peer group is the key factor in any undergraduate student's development. Dr. Astin opined that the peer group in the VWIL program will differ radically from that at VMI and therefore the benefits will not be comparable. Tr. 1219-21 (Astin). However, Dr. Astin testified that he does not know what type of peer group will be in the VWIL program. Tr. 1272 (Astin).
[7] Dr. Astin acknowledged that he has made no study of the outcomes of VMI or of MBC. Tr. 1306-07 (Astin). He has not determined what would be required in the VWIL program to achieve VMI outcomes. Tr. 1289 (Astin).
[8] Dr. Jacklin agreed that experts could reasonably disagree with her opinion. Specifically, Dr. Jacklin stated that experts could reasonably disagree as to how to accommodate differences in formulating educational programs. Tr. 906, 921-22 (Jacklin).
[9] According to Dr. Jacklin, this trend could be exacerbated in a co-educational environment. Tr. 887 (Jacklin).
[10] Dr. Wilson concurred, testifying that women do not need the leveling experience of a rat line and adversative methods and that women are generally raised with a lower self-image than men. Tr. 340 (Wilson).
[11] Dr. Fox-Genovese explained: "My position is that the existence of [tax-supported] single-sex education is an extremely important option."
[12] Dr. Richardson examined demand at Virginia Tech and at West Point and concluded that the demand for an all-women's VMI would be so small as to make the project unfeasible. Tr. 611-15 (Richardson). At trial, Dr. Richardson testified that he interviewed 20 women currently enrolled in the ROTC program at VPI and only one of the 20 wanted a VMI-type experience. Dr. Richardson further testified that a mirror-image VMI would only enroll 25-30 students.
[13] Dr. Riesman was not involved directly in preparing the Plan. Tr. 543 (Riesman). He knows MBC's president, Dr. Tyson, and has reviewed drafts of the Plan and responded to requests for his comments. Tr. 508 (Riesman).
[14] Tr. 210-11 (Lott); See also Plf.'s Ex. 102.
[15] Based on his experience with new programs in higher education in the Commonwealth, Dr. Finley testified that 25 is a good projection of the first VWIL class size. The prototype class for the new College of Integrated Science and Technology at James Madison University is 40. Dr. Finley has reviewed proposals for other new programs with numbers in the 10 to 25 range. Tr. 131 (Lott).
[16] Dr. Lott, Dean of MBC, developed the financial projections for the VWIL program that are reflected in Defendants' Exhibit 45.
[17] Dr. Lott testified that the financial projections that he prepared, and which are reflected in defendants' Exhibit 45, were based upon the amount of money necessary to cover the start-up costs of the VWIL program regardless of the number of students in the VWIL program. The start-up funding is adequate for the projected 25 VWIL students in the first year of operation, and, if more than 25 students are admitted to the VWIL program in the first year, the additional revenue from the Commonwealth, and the tuition provided by these students, will be adequate to cover the marginal increased costs. Tr. 220-21 (Lott).

Dr. Finley prepared a "Pro-Forma Expenditure & Income Statement" for the VWIL program based upon his review of the financial projections of the VWIL program prepared by Dr. Lott and his discussions with Dr. Lott. Defs.' Ex. 15. As projected by Dr. Finley, the VWIL program will produce income in excess of expenditures for the first four years of operation of $48,700; $215,775; $398,026; and $606,559. The projected contingency funds available for the first four years of operation of the VWIL program are 7.7%, 24.8%, 35.2% and 43.7% of revenues over expenditures. Defs.' Ex. 15. In conducting his review, Dr. Finley relied upon the professional judgment of Dr. Lott and that of his colleagues in putting the VWIL program together. Dr. Finley's approach was to review with Dr. Lott each of Dr. Lott's assumptions to determine whether it was reasonable, and to review with the MBC administration whether it had resources in place to address each of the components of the Remedial Plan. Dr. Finley testified that he was convinced that this had been accomplished. Tr. 1488 (Finley).
Dr. Finley testified that based upon his discussions with Dr. Lott, his knowledge of Dr. Lott's professional experience, and based upon a series of questions posed, he believed that Dr. Lott had used appropriate concepts in developing his financial basis for the VWIL program, had thought through the VWIL program very carefully, and had well laid his plans for adding faculty where needed. Tr. 1460-61, 1512 (Finley). Furthermore, in addition to the anticipated income in excess of expenses stated above, the VWIL program will have the additional asset of the Unique Military Appropriation which will be shared per capita by the entire Virginia Corps of Cadets. Tr. 1466-67 (Finley); 668-70 (Sgro).
Based upon his analysis and review, Dr. Finley opined that, if more than 25 students enroll in the VWIL program the first year, increased economies of scale would permit the program to be financially feasible. Tr. 1467 (Finley). On the income side, the revenue from tuition and fees would increase, the VMI endowment income would remain the same, and the state contract would expand to accommodate the additional students. The Budget Bill, as introduced, contains the proviso that, in the event more than 25 students enroll in the first year, the Commonwealth would put in additional monies on a per-student basis to accommodate the increase. Tr. 1467 (Finley).
[18] According to the United States, each institution will collect $6,830.00 in tuition from each student. The United States argues that VMI students will have an additional $490,415.00 of state financial aid distributed to them to help defer the costs of the $6,830.00 in tuition and fees  but no money has been designated by the Commonwealth to help defer the amount of tuition and fees to be collected from VWIL students. The evidence indicates, however, that the Commonwealth will pay dollar-for-dollar for VWIL students as it pays for VMI. Defs.' Ex. 12 at 94. For a student to obtain additional funds at either institution, he/she must qualify for student aid on the basis of need.
[19] In addition, the Unique Military Appropriation which VMI receives will be shared on an equal, pro rata, basis with MBC and Virginia Tech so that each of the three corps of cadets will receive financial support from the Unique Military Appropriation presently provided only to VMI. Tr. 668-70 (Sgro); Tr. 1466-67 (Finley); Defs.' Ex. 12 at 128-29. Furthermore, the State Cadetships, presently allotted only to VMI, will be shared equitably among the students participating in the three Corps of Cadets. Id.
[20] Although former Governor Wilder, during his brief campaign for the 1992 Democratic presidential nomination, made extrajudicial statements criticizing VMI's all male admissions policy, his position in this Court has always been one supporting VMI's all male admissions policy. See Governor Wilder's Answer, Liability Trial. In any case, Governor Wilder's prior extrajudicial statements against VMI's all male admissions policy notwithstanding, the former Governor's affidavit tendered in this phase of the litigation again expresses his support of single-sex education for men and women by "approv[ing] the remedial plan proposed by the VMI defendants." See VMI Remedy Ex. 5. See also Defs.' Ex. 11-R at 2-3. (Governor Wilder's statement supporting the VWIL plan stating that he is "satisfied that this plan is educationally sound and will remedy all current discrimination.").
[21] In addition to supporting the remedial plan, Governor Allen explains in his affidavit that a VMI for women "is economically prohibitive. The lack of demand, the dubious educational benefit and the tremendous cost of establishing such a college preclude that option." Defs.' Ex. 1.
[22] As one commentator aptly observes, the purpose of the remedy in this case "is not that VMI ought to be preserved as an all-male bastion, but that the Commonwealth ought to be given broad leeway in determining how best to ensure that women are provided an equal opportunity within the Commonwealth's system of higher education." Allan Ides, The Curious Case of the Virginia Military Institute: An Essay on the Judicial Function, 50 Wash. & Lee L.Rev. 35, 47 (1993).
[1] Mr. Brewer testified on the facilities at VMI and MBC. From the liability phase, the Court is already familiar with VMI facilities. Both the Justice Department and the Defendants submitted video tapes of MBC which depicted MBC facilities. Defs.' Ex. 44A; Plf.'s Ex. 104. Mr. Brewer's testimony, essentially factual in nature, shed little additional light on this marginal issue, and the Court is not in need of expert testimony to assist in its understanding of the schools' facilities.
[2] The United States proffered the testimony of Col. Siket who described a "day in the life" of West Point cadets. As this subject was covered at length in the liability phase of this proceeding, the Court granted the defendants' motion to strike the testimony of Col. Siket, and his testimony played no part in the Court's determination of the issues on remand. Tr. 981 (Siket).